STATE OF NORTH CAROLINA v. MICHAEL EARL SEXTON

No. 499A91

(Filed 17 June 1994)

**1. Jury § 260 (NCI4th)— peremptory challenge of blacks—race-neutral reasons—no disproportionate exclusion of blacks**

The trial court did not err by concluding that there was no purposeful racial discrimination in the prosecutor's peremptory challenges of four black jurors where the prosecutor offered the following race-neutral reasons for challenging the jurors: (1) one juror changed her view of the death penalty several times during voir dire; (2) the second juror made no eye contact with the prosecutor during voir dire, stated on her questionnaire that her brother was in prison, and knew a defense witness; (3) the third juror wore an earring, was 22 years old, and was unemployed; and (4) the fourth juror's husband worked for a hospital as did defendant prior to his arrest, and a member of her family was arrested for child support. Furthermore, the prosecutor's stated basis for these peremptory challenges did not result in a disproportionate exclusion of blacks where the venire consisted of seventy-nine whites and six blacks; at the time of defendant's challenge, the prosecutor had exercised a peremptory challenge against a white juror and four against black jurors; the prosecutor did not excuse all four blacks for the same reason; and one seated member and an alternate member of the jury were members of the black race.

**Am Jur 2d, Jury § 235.**

**Proof as to exclusion of or discrimination against eligibile class or race in respect to jury in criminal case. 1 ALR2d 1291.**

**Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.**

**2. Jury § 141 (NCI4th)— capital trial—parole eligibility—jury ·voir dire—mitigating circumstances**

The trial court did not err by refusing to permit the defendant in a capital trial to examine prospective jurors about parole eligibility or by refusing to submit to the jury mitigating circumstances relating to parole.

STATE v. SEXTON

[336 N.C. 321 (1994)]

Am Jur 2d, Jury § 197.

Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.

3. Jury § 223 (NCI4th) — capital punishment beliefs — excusal for cause

The trial court in a capital trial did not err by allowing the State's challenges for cause of two prospective jurors whose voir dire answers revealed that they were opposed to the death penalty and that their personal convictions would substantially impair the performance of their duties as jurors.

Am Jur 2d, Jury § 290.

Comment Note — Beliefs regarding capital punishment as disqualifying juror in capital case — post-Witherspoon cases. 39 ALR3d 550.

4. Jury § 215 (NCI4th) — predisposition to impose death penalty — ability to consider life imprisonment — denial of challenge for cause

The trial court in a capital trial did not err by denying defendant's challenge for cause of a prospective juror who first expressed a predisposition to impose the death penalty but then indicated that he could put aside his leaning toward the death penalty and consider life imprisonment as a punishment.

Am Jur 2d, Jury § 290.

Comment Note — Beliefs regarding capital punishment as disqualifying juror in capital case — post-Witherspoon cases. 39 ALR3d 550.

5. Jury § 111 (NCI4th) — capital trial — jurors who recalled media coverage — individual voir dire denied

The trial judge in a capital trial did not abuse his discretion in the denial of defendant's request for individual voir dire when a panel of jurors indicated that they recalled media coverage of the crimes where the trial judge stated that he thought the situation could be handled by proper questions but that "if it gets too bad, we will have to send them out and just take them one at a time," and at no other time

during jury selection did defense counsel specifically request individual voir dire.

Am Jur 2d, Jury § 197.

6. Evidence and Witnesses § 666 (NCI4th) — admission of defendant's pretrial statement — failure to object at trial — tactical decision — waiver of right to assign as error

In a prosecution for the capital crime of first-degree murder and the noncapital crimes of first-degree kidnapping, first-degree rape, first-degree sexual offense and common law robbery, defendant's failure to object at trial to the admission of his pretrial statement to a detective waived any right to assign admission of that statement as error on appeal where defendant made a tactical decision to let the statement come in without objection because the statement tended to bolster defendant's defense of consent to the kidnapping, rape and sexual offense charges, defendant's testimony showing the lack of specific intent to kill formed after premeditation and deliberation, and defendant's credibility when giving consistent testimony at trial.

Am Jur 2d, Appeal and Error § 601-603; Trial §§ 162, 166, 173.

7. Evidence and Witnesses § 1693 (NCI4th) — enlarged photograph of victim's body — admissibility for illustrative purposes

An enlarged photograph of the victim's naked body taken at the crime scene was properly admitted in this murder, kidnapping, rape and sexual offense prosecution to illustrate one officer's testimony about the location of defendant's hairs recovered from the victim's body and to illustrate a second officer's testimony about body areas from which he took swabs and the wetness of the victim's hair. The photograph, though enlarged, was not used excessively.

Am Jur 2d, Homicide §§ 417 et seq.

Admissibility in evidence of enlarged photographs or photostatic copies. 72 ALR2d 308.

8. Evidence and Witnesses §§ 334, 3015 (NCI4th) — prior conviction — cross-examination about details — admissibility to show intent

In a first-degree murder prosecution in which defendant admitted that he had previously been convicted of assaulting

STATE v. SEXTON

[336 N.C. 321 (1994)]

his girlfriend, the prosecutor's cross-examination of defendant as to whether he had choked his girlfriend was admissible under Rule 404(b) to show intent and was not precluded under Rule 609 where the murder was committed by choking the victim; the prior assault by choking had occurred less than a year before the murder and was thus not remote in time; defendant's defense to the murder charge was lack of a specific intent to kill; defendant testified that he could not recall choking either the assault or the murder victim; and evidence that defendant had recently choked another victim was relevant to show his intent.

**Am Jur 2d, Evidence § 324; Homicide § 310; Witnesses §§ 581 et seq.**

**Construction and application of Rule 609(a) of the Federal Rules of Evidence permitting impeachment of witness by evidence of prior conviction of crime. 39 ALR Fed. 570.**

**Admissibility, under Rule 404(b) of the Federal Rules of Evidence, of evidence of other crimes, wrongs, or acts similar to offense charged to show preparation or plan. 47 ALR Fed. 781.**

9. **Evidence and Witnesses § 2889 (NCI4th)— cross-examination of defendant—relevancy to show normal intelligence and clearheadedness**

The prosecutor's cross-examination of the defendant in a murder, kidnapping, rape and sexual offense prosecution as to whether he had a driver's license, graduated from high school, or had consumed drugs at the time of the murder was relevant to show that defendant was a person of normal intelligence who was clearheaded at the time of the crimes.

**Am Jur 2d, Witnesses §§ 484 et seq.**

10. **Evidence and Witnesses § 123 (NCI4th)— deceased rape victim—rape shield statute—victim's sexual behavior—testimony by defendant—rebuttal evidence admissible**

Where a rape victim is deceased and the defendant's own testimony brings into question the victim's sexual behavior, the rape shield statute is not violated by the prosecution's presentation of rebuttal evidence relating to the victim's prior sexual conduct to challenge the credibility of defendant's

testimony. Therefore, where a defendant on trial for murder, kidnapping, rape and sexual offense testified that the victim stated that she wanted to cheat on her husband and was the instigator of consensual sexual acts, including oral sex, rebuttal testimony by the victim's co-workers that the victim was not flirtatious and had a reputation for marital fidelity and by her husband that to his knowledge the victim had never cheated on him and had an aversion to oral sex did not violate the rape shield statute. N.C.G.S. § 8C-1, Rule 412.

**Am Jur 2d, Rape §§ 55 et seq.**

**Constitutionality of "rape shield" statute restricting use of evidence of victim's sexual experiences. 1 ALR4th 283.**

11. **Evidence and Witnesses § 264 (NCI4th)— rape and sexual offense—attack on victim's character for marital fidelity—rebuttal character evidence**

Where the defendant in a murder, kidnapping, rape and sexual offense trial testified not only that the victim was the instigator of consensual sexual acts but also that the victim stated that she wanted to cheat on her husband, defendant's attack on the victim's character for marital fidelity went beyond what was necessary for his consent defense and opened the door to the admission of the State's rebuttal evidence about the victim's general good moral character, devotion to family, and reputation for marital fidelity. N.C.G.S. § 8C-1, Rule 404(a).

**Am Jur 2d, Evidence §§ 336 et seq.**

12. **Kidnapping and Felonious Restraint § 16 (NCI4th)— sufficient evidence of forcible removal**

The State's evidence was sufficient to support an inference that defendant forcibly removed a rape and murder victim across a parking lot to her van and then to the murder scene by threats and intimidation and was thus sufficient to support defendant's conviction of first-degree kidnapping where it tended to show that the victim was carrying her handbag, a portfolio containing books, and her open umbrella as she left work and walked across a parking lot toward her van; her umbrella, open, upside down, and containing water, was later observed in the parking lot; when defendant first saw the victim, he was holding a screwdriver he habitually used to start the car he was driving; the victim's shoe tops bore striate scratches,

STATE v. SEXTON

[336 N.C. 321 (1994)]

and the knee areas of her panty hose had striate holes; her body had scrapes on both knees and near the right elbow; she had a deep bruise, consistent with a defensive wound, on her forearm and scrapes on her right cheek and under her nose; and she had no scrapes or bruises in her mouth area at the time she left work.

**Am Jur 2d, Abduction and Kidnapping § 32.**

13. **Criminal Law § 445 (NCI4th) — prosecutor's closing argument — victim's consent against human nature — no impropriety**

The prosecutor did not impermissibly personalize the victim's ordeal by arguing to the jury in a murder, kidnapping, rape and sexual offense case that "it would defy human nature for [the victim] to have volunteered to assist defendant and put herself in a position to have a consensual conversation with him" where the record discloses that the prosecutor tied this assertion with evidence that it was raining heavily, the victim had called her husband to tell him she was leaving work, and her umbrella was abandoned in the parking lot where her van was parked.

**Am Jur 2d, Trial §§ 305, 306.**

14. **Criminal Law §§ 438, 466 (NCI4th) — prosecutor's closing argument — characterization of defendant as liar — absence of prejudice — remark about slander not improper**

It was improper for the prosecutor in a murder, kidnapping, rape and sexual offense trial to argue to the jury that defendant was a liar and that he had lied to his girlfriend and to the jury, but defendant failed to show that this error was prejudicial considering the overwhelming evidence against him. Furthermore, the prosecutor did not improperly suggest that defense counsel had orchestrated a slander where his mention of slander in his jury argument clearly referred to defendant's consent defense as a defense and not to the actions of defense counsel.

**Am Jur 2d, Trial §§ 218 et seq.**

**Negative characterization or description of defendant, by prosecutor during summation of criminal trial, as ground for reversal, new trial, or mistrial — modern cases. 88 ALR4th 8.**

STATE v. SEXTON

[336 N.C. 321 (1994)]

15. **Criminal Law § 465 (NCI4th) — prosecutor's closing argument — premeditation and deliberation — no impropriety**

The prosecutor's closing argument in a first-degree murder case about the irrelevancy of any anger or emotion by defendant was not a misstatement of the law of premeditation and deliberation since the prosecutor was entitled, on the evidence presented by the State, to urge the jury not to return a verdict of guilty of second-degree murder. Furthermore, the prosecutor did not incorrectly state that the judge would instruct "that [defendant] acted with deliberation" where he used the conditional "if" throughout his remarks about premeditation and deliberation.

**Am Jur 2d, Trial § 640.**

**Counsel's right in criminal prosecution to argue law or to read lawbooks to the jury. 62 ALR2d 245.**

16. **Kidnapping and Felonious Restraint § 28 (NCI4th) — consent by fraud — evidence justifying instruction**

The evidence in a kidnapping case was sufficient to show trickery employed to accomplish removal so as to justify the trial court's instruction that consent obtained by fraud is not consent where defendant stated in his confession that he first asked the victim for a ride to a hospital security office but then told the victim to drive down a nearby road because he pretended that his cousin's car was there, and defendant stated that he thought the victim agreed to give him a ride because she saw his hospital employee identification tag and thought it would be "O.K." to give him a ride.

**Am Jur 2d, Abduction and Kidnapping § 32.**

**Kidnapping by fraud or false pretenses. 95 ALR2d 450.**

17. **Criminal Law § 447 (NCI4th) — capital sentencing — jury argument — rights of victim and family — intervention not required**

Any error in the prosecutor's reference to the rights of the victim and her family in his jury argument in a capital sentencing proceeding was *de minimis,* and the trial court did not abuse its discretion by failing to intervene *ex mero motu.*

**Am Jur 2d, Trial §§ 296 et seq.**

STATE v. SEXTON

[336 N.C. 321 (1994)]

## 18. Criminal Law § 1309 (NCI4th) — capital sentencing — evidence of victim's character — no constitutional violation

Defendant's constitutional rights were not violated in a capital sentencing proceeding for the first-degree murder of a kidnapping and rape victim by the admission of evidence of the victim's character for marital fidelity when all of the evidence in the guilt-innocence phase was resubmitted to the jury since this evidence was properly admitted during the guilt-innocence phase; all evidence presented during the guilt-innocence phase of a capital case is competent for the jury's consideration in passing on punishment pursuant to N.C.G.S. § 15A-2000(a)(3); the Eighth Amendment does not prohibit either the admission of evidence or prosecutorial argument concerning a murder victim's personal characteristics; evidence of the victim's character was narrowly focused on rebutting defendant's testimony at trial that the victim indicated she wanted to be unfaithful to her husband; and the prosecutor did not make any argument based on this evidence.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Admissibility in rape case, under Rule 412 of Federal Rules of Evidence, of evidence of victim's past sexual behavior. 65 ALR Fed. 519.**

## 19. Criminal Law § 1343 (NCI4th) — capital sentencing — especially heinous, atrocious, or cruel aggravating circumstance — constitutionality

The "especially heinous, atrocious, or cruel" aggravating circumstance for the capital crime of first-degree murder set forth in N.C.G.S. § 15A-2000(e)(9) is constitutional on its face and as applied in this case where the N.C. Supreme Court has applied a limiting construction to the language of this circumstance, and this limiting construction was embodied in the instructions given to the jury in this case.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like — post-Gregg cases. 63 ALR4th 478.**

20. **Criminal Law § 1344 (NCI4th) — capital sentencing — especially heinous, atrocious, or cruel aggravating circumstance — sufficiency of evidence**

The trial court did not err by submitting the especially heinous, atrocious, or cruel aggravating circumstance to the jury in a capital sentencing hearing because the evidence supported a finding that the murder was physically agonizing to the victim and involved psychological terror not normally present in a first-degree murder where it tended to show that the victim was kidnapped, sexually assaulted, and killed by ligature strangulation; a death by ligature strangulation would have taken three to four minutes at a minumum and the victim would have known what was happening for at least ten seconds before losing consciousness; the amount of time for unconsciousness and death varies depending upon how tightly and rapidly the ligature was applied, and the only internal injury to the victim's neck was some slight bruising of the tissues over her windpipe; and defendant was in front of or beside the victim when he strangled her, and she was aware of defendant's presence and murderous purpose.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like — post-Gregg cases. 63 ALR4th 478.**

21. **Criminal Law § 1355 (NCI4th) — capital sentencing — mitigating circumstance — no significant criminal history — evidence insuffient**

The trial court did not err by failing to submit to the jury in a capital sentencing proceeding the mitigating circumstance that defendant had "no significant history of prior criminal activity," N.C.G.S. § 15A-2000(f)(1), where the evidence of defendant's prior criminal activity was a conviction for forgery and uttering on 1 May 1989 and conviction for two counts of assault on a female on 22 October 1989; one of these counts was assault by choking which occurred less than one year before the strangulation of the victim in this case; and defendant testified that he did not remember choking the former victim and did not remember the details of the strangulation of the present victim. Given the nature and recency of defend-

**STATE v. SEXTON**

[336 N.C. 321 (1994)]

ant's record of assault, the trial court did not err in determining that no reasonable juror could have concluded that defendant's criminal history was insignificant.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**22. Criminal Law § 1302 (NCI4th) — capital trial — guilty verdicts — alternative motions to withdraw and select new jury for sentencing**

The trial court in a capital trial did not err in denying defense counsel's motion to withdraw from representation, or in the alternative to select a new jury after the guilty verdicts, on the ground that the jurors' rejection of the defense theory and counsel's role in presenting it would have precluded their rational consideration of evidence submitted in mitigation.

**Am Jur 2d, Criminal Law § 600.**

**23. Criminal Law § 1373 (NCI4th) — first-degree murder — death sentence not disproportionate**

A sentence of death imposed upon defendant for first-degree murder was not disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, where defendant brutally strangled the random victim in the course of a kidnapping, rape, and sexual offense; defendant was convicted upon theories of both premeditation and deliberation and felony murder; the jury found as aggravating circumstances that the murder was especially heinous, atrocious, or cruel, was committed to avoid or prevent a lawful arrest, and was committed while defendant was engaged in the commission of first-degree kidnapping, first-degree rape, first-degree sexual offense, and robbery; the jury declined to find the existence of any of the five statutory mitigating circumstances submitted for their consideration and found the existence of eighteen of the twenty-seven nonstatutory mitigating circumstances submitted; defendant insisted, even in the face of clear evidence to the contrary, that the victim consented to the sexual acts; defendant insisted, notwithstanding clear evidence to the contrary, that he left the victim alive; and defendant stole the victim's personal effects, including her ATM card, and withdrew money from her bank account.

**Am Jur 2d, Criminal Law § 628.**

STATE v. SEXTON

[336 N.C. 321 (1994)]

Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-Gregg cases. 63 ALR4th 478.

Sufficiency of evidence, for death penalty purposes, to establish statutory aggravating circumstance that murder was committed in course of committing, attempting, or fleeing from other offense, and the like—post-Gregg cases. 67 ALR4th 887.

Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was committed for pecuniary gain, as consideration or in expectation of receiving something of monetary value, and the like—post-Gregg cases. 66 ALR4th 417.

Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Farmer, J., at the 9 September 1991 Criminal Session of Superior Court, Wake County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments imposed for first-degree kidnapping, first-degree rape, first-degree sexual offense, and common-law robbery was granted 19 October 1992. Heard in the Supreme Court 13 April 1993.

*Michael F. Easley, Attorney General, by Valerie B. Spalding, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Henderson Hill, Director, Death Penalty Resource Center, for defendant-appellant.*

PARKER, Justice.

Defendant was tried capitally on an indictment charging him with the first-degree murder of Kimberly Crews (herein "victim"). The jury returned a verdict finding defendant guilty of first-degree murder upon the theories of (i) premeditation and deliberation and (ii) felony murder. Following a sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended that defendant be sentenced to death. Execution was stayed 12 November 1991 pend-

ing defendant's appeal. The jury also found defendant guilty of first-degree kidnapping, first-degree rape, first-degree sexual offense, and common-law robbery; and the trial court sentenced defendant to forty years for the kidnapping, life for the rape, life for the sexual offense, and ten years for the robbery, each sentence to run consecutively. For the reasons discussed herein, we conclude the jury selection, guilt-innocence phase, and sentencing proceeding were free from prejudicial error and the death sentence is not disproportionate.

State's evidence tended to show that the victim was a child sexual abuse counselor whose office was located in the Wake Area Health Education Center at Wake Medical Center in Raleigh, North Carolina. Alan Crews, the victim's husband, testified that she usually left her office around 3:30 p.m. each day to pick up their daughter; but on Wednesdays she worked later in order to accommodate clients. Shortly before 6:00 p.m. on Wednesday, 8 August 1990, the victim telephoned her husband, who was at home with their daughter, to ask if the family needed anything from the store. The victim habitually telephoned to let her husband know she was leaving work, and the trip home took from twenty to thirty minutes. By 7:00 p.m., she had not arrived at home; and although her husband was concerned, he thought her delay might be related to the stormy weather that evening. By 8:00 p.m. the victim had not come home, and her husband was worried. It was not her habit to be late when she said she was coming home, nor was it her habit to be away from home at night without telling her husband where she would be. Not wanting to alarm his daughter, Alan Crews put her to bed and waited for her to fall asleep before attempting to locate his wife. Thinking he might have forgotten or been unaware of his wife's plans, he first telephoned a friend with whom his wife often exercised. The friend said she and the victim had in fact planned to exercise but changed their plans on account of the stormy weather. Crews next telephoned 911 and was advised to call area hospitals. He telephoned three hospitals, but none had admitted his wife. He again telephoned 911 and asked that an officer come to his home.

The officer arrived, took a brief statement, and asked some questions. He was called away to a robbery but soon returned. The officer asked about possible routes used by the victim in driving home from work and then left to begin checking the routes. Later the officer returned and reported the victim had not been

found. Sometime after 1:00 a.m. on 9 August, other officers came to the Crews' residence and told Alan Crews they had found his wife dead in her grey 1986 Plymouth Voyager van.

Raleigh Police Detective Ronnie Holloway testified that shortly after midnight he and another officer searched for the victim around Wake Medical Center. It was raining heavily. They searched the employee and public parking lots, and as they drove towards the rear parking deck, Holloway saw a vehicle with its lights on. The vehicle was on Galahad Street and about 200 yards away from and facing a medical center parking deck. The officers approached the vehicle, confirmed that it was the Voyager van they were seeking, and saw a body in the backseat. Holloway testified that at first he thought the body was a mannequin, "but it was a white female with black hair, nude. She was lying on her back side and her arms were down[,] the left hanging toward to [sic] the floor of the van and the right one was laying [sic] across her body and the legs were spreaded [sic] open." The officers did not touch anything in the van; they sealed off the area and summoned other investigators.

W.E. Hensley, crime scene specialist for the City-County Bureau of Identification ("CCBI"), videotaped the scene. The tape was shown to the jury. Leonard Colvin, identification technician for the CCBI, made still photographs of the scene and gathered trace evidence. At trial he identified evidence including the victim's panties and panty hose, a rape suspect kit from Alan Crews, a similar kit from the defendant, and various items of personal property belonging to the victim. Colvin testified that the victim's keys, employee parking lot entry card, health club membership card, and other personal items were recovered from a water filled ditch on Old Bunch Road. The victim's pocketbook, grey portfolio containing books, and panty hose were found beside the same road. Her black and tan umbrella was found nearby, as well as her checkbook, which was propped up against a tree. Her dress was recovered from the side of Hodge Road. Defendant cooperated with and assisted the officers in recovering many of these items. Colvin also identified defendant's Wake Medical Center employee identification badge and clothing worn by defendant at the time of the murder. Defendant gave these to officers at his home in Plummer's Trailer Park.

Johnny Leonard, latent examiner for the CCBI, identified the victim's shoes. The left shoe was found near the front passenger

seat; the right shoe was underneath the brake pedal. No prints from these shoes were found in the van, and both shoes had striate scars on the toes and toe tops. Further, Leonard examined the shoes worn by defendant and determined that muddy footprints in the van were made by them. One of defendant's footprints was lifted from the victim's shoe recovered near the front passenger seat. Leonard also testified on direct and redirect examination that the front floor mat was upside down. On recall he testified that the backseat floor mat was upside down. Further, although defendant's left shoe made two separate impressions on a floor mat near the sliding door of the van, only one print showed traces of mud.

Scott Worsham, forensic chemist for the State Bureau of Investigation ("SBI"), was accepted by the court as an expert in hair examination and identification. He identified exhibits consisting of tapings made from the victim's body and her van. He testified that head hair consistent with defendant's was found on (i) the carpet around the driver's and passenger's front seats, (ii) the driver's seat cushion and seat back, (iii) the van's middle seat, (iv) the van headlining above the backseat and over the victim's head, and (v) the victim's chest or shoulder. Pubic hair consistent with defendant's was found on the rear seat underneath the victim's body, in combings from the victim's pubic area, and on the victim's back and buttocks. Defendant's pubic hairs found on the victim's body bore follicular tags, indicating removal under force.

Worsham also noted that the victim's brassiere and slip were on the van floor near her left foot, and both garments were saturated and clean. Further, the victim's hair was wet. It was soaked through, rather than damp in areas which would be consistent with exertion. Her body was damp, cool, and clean; and there were bruises on the insides of her elbows, on her kneecaps, and on her lip. In addition, the legs of her panty hose had been stretched, and there were striate holes in the knee areas.

SBI Agent John Wayne Bendure was accepted by the court as an expert in fiber identification and comparison. He testified that fibers from defendant's shirt and shorts were found on the victim's dress, and in Worsham's tapings from the victim's (i) back and buttocks, (ii) legs, abdomen, chest, and arms, and (iii) chest and shoulders. In addition, fibers from the seat covers in the van were found on defendant's clothes. Bendure also noted abrasions, holes, and runs in the knees of the victim's panty hose.

SBI Agent David J. Spittle was accepted by the court as an expert in serology. He testified that defendant's blood type was B and he was a secretor. The victim's blood type was O, her husband's was A, and no type A fluids were found on the victim's body. By contrast, swabs taken from the victim's mouth showed the presence of spermatozoa consistent with defendant's blood type. Fluid on the victim's upper arm was semen, but the quantity was insufficient for complete analysis. In addition, vaginal swabs from the victim showed the presence of defendant's spermatozoa, which was also found on the seat under her buttocks. Fingernail scrapings from the victim did not contain any blood. Spittle also observed that the victim's hair was very wet.

Robert McCoy testified that he supervised the Wake Medical Center laundry, where defendant was employed. On 8 August 1990 defendant was already at work when McCoy arrived around 2:00 p.m. Sometime around 3:30 p.m., when the laundry room shift changed, defendant was missing. Another employee came in, and McCoy told him to begin operating the machinery since defendant was not there. The next time McCoy saw defendant was after "everybody had punched out." Defendant came running in through the back ramp, and he was soaking wet. Defendant said, "I got to go. I got to go. I was out there fixing my young lady's car and that was the only thing I was out there doing." McCoy said he would discuss the matter with defendant the next day because defendant "said he was in this big rush to leave." Defendant's time card showed he left at 6:30 p.m. that day.

Diane Simpson, Communications Department Supervisor for IBM Coastal Credit Union, testified that the victim had an account with the credit union. Records showed that on 8 August 1990 at 6:50 p.m., someone withdrew $100.00 from the victim's checking account by use of an automatic teller machine at Centura Shopping Center on Poole Road in Raleigh. At 7:30 p.m. on the same day, there was also a withdrawal request for $200.00 from the victim's savings account. This request, made from an automatic teller machine at the Triangle East Shopping Center in Zebulon, was denied because it exceeded a daily withdrawal limit.

Leon Turner testified that around 6:40 p.m. on 8 August 1990, he used the automatic teller machine at the Poole Road site, which is about two miles from Wake Medical Center. It had been raining that day and was still drizzling. A man was using the machine,

so Turner stood to one side. The man kept turning to look at Turner, who turned away. The man looked again and went back to his car, which was running. As Turner used the machine, the noise of the car's engine continued, and the car did not leave. When Turner was through and driving away, he looked back and saw the same man approach the machine again. Turner identified the man as defendant.

Angela Perry testified that in August of 1990 she and her daughter lived in Plummer's Trailer Park near Old Bunch Road in Zebulon, North Carolina. Defendant lived with them. Angela owned a 1986 Chevrolet Cavalier automobile which was difficult to start; defendant did not own an automobile. Defendant kept a screwdriver under the seat of Angela's car and used it under the hood when starting the car. The screwdriver was longer and bigger than a pencil. Angela usually drove defendant to Wake Medical Center before reporting to work. Ordinarily, defendant drove Angela's car to work only on alternate Thursdays. His paycheck was mailed to Angela's residence, and he used the car to drive home and get his check. Wednesday, 8 August 1990, was the day before defendant's payday. On that morning Angela did not go to work because she was sick, and defendant drove her car to work. About 7:45 p.m. on that evening, defendant telephoned Angela and said her "car wouldn't go over 20 or 30 miles and that he would be home." He returned home around 8:00 p.m., and Angela was angry because he was late. He remained at home for about fifteen minutes, left with a friend to go to the store, and returned with a pack of cigarettes. Except for arriving home late, he behaved as he normally did. However, he ordinarily had no money on the day before payday, and most of his paycheck was used in paying bills.

The next morning Angela had an appointment with her doctor, and defendant said he would drive her there but needed to stop by Wake Medical Center to explain why he could not work. He used the screwdriver to start Angela's car. After Angela's appointment, the two returned home to pick up defendant's paycheck and went out to pay bills. Again, defendant's behavior seemed normal. On the next day, Friday, Angela remained at home, but defendant returned to work as usual and again came home late. Angela left to visit her neighbor across the street. When she returned home, defendant was leaving with police officers. The next time Angela talked to defendant was Saturday morning around 4:30 a.m. at the Raleigh Police Department. Angela and defendant's

sister, Dianne Sexton, asked defendant if he had committed the crime; and defendant, who was crying, admitted he strangled the victim. Later defendant told Angela he did not know the victim was dead until Thursday morning, when he went to Wake Medical Center to explain why he could not work.

Kaye Johnson testified that she was employed by Wake Medical Center and was at work on 8 August 1990. She telephoned her husband about 5:45 p.m. and told him she needed to work for about one more hour. However, when she realized it was raining heavily, she decided to leave and take her work home. As she left the building a little before 6:00 p.m., it was pouring down rain. She walked through the parking lots to Parking Lot 4, and as she approached her car, she noticed an open umbrella in good condition in front of the car. Johnson testified she particularly noticed the umbrella because in such heavy rain, it would be unusual for anyone to set down an umbrella before getting into a vehicle. On Thursday or Friday, she heard her co-workers discussing the victim's death and remembered the umbrella. Later her supervisor saw officers investigating in Lots 3 and 4 and suggested that Johnson report what she had seen. Johnson did so; and in court she testified that an umbrella, previously identified as the victim's, looked like the one she saw. On cross-examination, Johnson testified that she did not recall ever having seen a grey Voyager van parked near her car and to the best of her knowledge, the victim's umbrella looked like the one she had seen, which was lying upside down with water in it.

Chief Medical Examiner Dr. John D. Butts, who performed an autopsy on the victim's body, was accepted by the court as an expert in pathology. He testified that he observed facial injuries consisting of a scraping of her right cheek and of her upper lip and a bruise associated with the latter injury. In association with the upper lip injury, there was a small cut on the victim's inner lip, over one of her front incisors. Around the front of the victim's neck were two burn-like ligature marks. On the right back of her neck, one course of the ligature burn went upward towards her right ear. Another course ended just at the base of her shoulder [neck]. At the back of her neck, the ligature courses merged. Other injuries to the victim's body included two bruises on the back of her left hand, a location consistent with their being defensive wounds. Another defensive wound, a deep bruise, was on the vic-

tim's forearm. There were also scrapes on both her knees and some scraping on the back of her right elbow.

Dr. Butts opined that the victim died as a result of ligature strangulation which obstructed the flow of blood to her brain. The ligature burns were "consistent with a single strand of some material looped twice around the neck and pulled backwards and to the [victim's] right." In Dr. Butts' opinion, the length of time required for someone to die of ligature strangulation would vary depending on how tightly and rapidly the ligature was applied. If the blood supply to the carotid arteries is cut off "almost instantaneously by extreme rapid application of sufficient pressure, a person will loose [sic] consciousness within about six to ten seconds and then if the ligature is kept applied for several minutes, fatal brain injury will occur and the person will invariably die." However, if the blood supply were not cut off immediately, it would take longer for unconsciousness to occur. Further, the only internal injury to the victim's neck was some slight bruising of the tissues over her windpipe.

On cross-examination Dr. Butts testified that the abrasions on the victim's knees and elbows occurred about the time of her death. He could not state that the ligature was applied only one time and with sufficient force to cause the victim to lose consciousness and die shortly thereafter. Although he did not observe a significant number of petechiae, or hemorrhages, on the victim's eyelids, petechiae more commonly results from manual strangulation. Moreover, when consciousness is lost during strangulation, the heart and lungs continue to operate; and if the ligature is released, the person will eventually regain consciousness. The range of time of application required to produce death is from three to four minutes.

On redirect examination, Dr. Butts testified that the six to ten seconds preceding loss of consciousness would be unpleasant and uncomfortable for a victim. During this time, the victim would be aware of what was happening.

Dr. David L. Ingram, the victim's supervisor, saw her around 4:00 p.m. on 8 August 1990. He testified that she did not have any scrapes or bruises about her mouth and her clothes were not in disarray.

Raleigh Police Detective John Howard testified that on 11 August 1990 he questioned defendant at home, on the way

to the police department, and at the department. At the department Howard made a recording of his conversation with defendant, and this recording was later transcribed. The jurors listened to the recording; copies of a sixty-page transcript were also provided for them. Through the first thirty-one pages of questioning, defendant repeatedly denied any involvement in the murder. Later, however, he admitted that the victim saw what he was doing and asked if he was having trouble. She said she would give him a ride to the security office at the front of the medical center. He got in the passenger side of the van, rode towards the front, and then told the victim to turn around. He complimented the victim on her appearance, she smiled, and he tried to get close to her. He said that she did not move, and he asked her to get in the back of the van. She got up and went to the back without saying anything. He asked her to take off her clothes, and she did so; but "then she, all of a sudden she like changed her mind and I like got upset. I was like, why you don't want to do it now, you done came this far? She was like, well, I don't want to do it." After that defendant did not know what happened, because "it just happened so quick. It's like I just grabbed her and the next thing I know she was out." Defendant denied having driven the van and stated further that he told the victim to drive to Galahad Street because his cousin's car was there and defendant could use the cousin's booster cables. Nevertheless, he also said he saw cables in the victim's van when he and the victim were in the back. In addition, he did not have sex with the victim because she changed her mind. He wrapped her panty hose around her neck two or three times and tightened them because she was trying to get out and kept trying to scream. He said, "[S]he just all of a sudden changed." When he left, he thought she had passed out but would probably wake up. He said, "I knew I probably if she woke up I knew I won't going to get away 'cause she knew who I was. She saw my face or whatever and she could just point me out." When he let her go she was still breathing, and he "just got up everything, hurry up and got out of there." Defendant's statements describing his actions at the teller machines corroborated the testimony of earlier witnesses as related above. The transcript also showed that defendant went with officers and assisted them in recovering evidence, as described above. Detective Howard also identified the screwdriver defendant used to start Angela's car.

At the close of State's evidence defendant moved to dismiss all the charges against him. The trial court denied the motions.

Defendant's evidence included his own testimony. He stated that on 8 August, on account of the rain, he left the laundry room to move Angela's car closer to his work area. The car would not start, and he attempted to use the screwdriver under the hood. Consistent with his recorded statement, he testified that the victim walked by and offered to take him to the security office. Defendant testified that he threw the screwdriver into the car, walked with the victim to her van, and got in on the passenger's side. The victim was carrying a handbag, her pocketbook, and an umbrella. Her van was less than 100 feet from defendant's car. Inside the van, the two introduced themselves, and the victim complimented defendant on his appearance. Defendant noticed she had a scratch on her lip and commented on it; the victim said it had just happened. The victim asked "if she could touch me or rub my chest" and defendant said, "[Y]es, that is up to you." He thought "[t]hat she was coming onto me." He testified, "I asked her was she married. She said yeah. So I said, what do you think about cheating and she said well, you have to cheat sometimes. So now I am thinking that maybe she just wanted to mess around or whatever." This conversation took place in the parking lot. He testified further, "So I asked well, do you feel like cheating now and she had said yes, or agreed her head like yes." Defendant tried to think of a good place to go and get acquainted with her. The victim put the van in gear and drove towards the front of the medical center. At Galahad Street, defendant said,

> [W]hy don't you turn right here. There should be a good place down in there and when she turned there we went all the way around and she made a U-turn and turned around and I noticed a car that looked kindly like my cousin's car. I said, that looks like my cousin's car, he might have some jumper cables or something. I said, park here. She parked there. And that is when I asked her was she ready. She said, yeah, and she got up and walked to the back of the van.

The victim was not wearing her shoes. Defendant testified further that he asked the victim "was she going to take off all of her clothes or whatever." The victim removed all her clothing, defendant removed his clothing, and the victim began to fellate him; but he did not ejaculate in her mouth. He testified that "[a]fter that, she like laid down on the seat and I got on top of her. We had sex." Afterwards defendant said he needed to get up, but the victim was trying to hold him down. She told him he could

not leave and that if he did, she would tell security that he forced her there and raped her. He said, "[Y]ou shouldn't do that because you know I didn't do that. You came here on your own will. So she kept hollering well, you leave and that is what I am going to do." The victim continued to scream, cursed at defendant, spit in his face, kneed him in the groin, and tried to run. He grabbed her and threw her on the seat. She continued to scream and curse and defendant kept telling her to be quiet. Defendant testified:

And then when I realized I had the stocking around her neck, she like went faint and I thought I had knocked her out, whatever. So I got up and I ran out the van. I think I got maybe a hundred or so feet in front of the van and I turned around and went back because I was thinking she [would] probably wake up and follow me. That is when I took all of her clothes and dress and stuff and pocketbook and I ran, ran back to my car and I got, I got it started and that is when I ran back to my job site and I ran inside and I saw my boss, Robert.

Defendant did not remember how long he had the panty hose around the victim's neck before he let go. He thought she was unconscious. He ran back to take her clothing and personal property to keep her from following him. He glanced quickly at the victim, and thought her eyes were open. He did not realize she was dead until the next morning, when he went to the medical center. Defendant also described going to the shopping center on Poole Road, using the teller machine, driving home, and throwing the victim's personal effects out the car window. He remembered that the victim set her umbrella down beside her seat and said he picked it up when he returned to the van.

Defendant testified further that he denied having sex with the victim because he was scared and thought he would get in more trouble. He repeated that the victim "just did everything that we did and all of a sudden changed her mind."

On cross-examination, defendant indicated that the victim's car was parked in the last or furthest parking lot away from the medical center. He admitted that while he was with the victim he was wearing his medical center identification tag, which bore his name and photograph. He insisted that on Wednesday night, Angela's car was pulling or jerking "like it wanted to [stall]" but admitted he did not observe this problem on Thursday. He testified

that his criminal record included a forgery and uttering charge and two assault charges. One of the assaults was on Angela. Defendant admitted that Angela said he had choked her, but defendant said he did not remember doing so.

Defendant admitted that he was clearheaded on the day of the murder and knew the area around Galahad Street well. He stated that when he first saw the victim, he had the screwdriver in his hand. Further, as the two walked towards her van, they were both under her umbrella. In addition, he removed his shirt while he was sitting in the van with the victim in the parking lot. This occasion was not the first time that someone had been overcome by his good looks. Although he had no relationship with the victim before that evening, he had previously had similar relationships with several other girls. At first he could not explain why semen was found in the victim's mouth, but later he said that while she was trying to hold him in the van, she was rubbing him and playing with his penis, which she put back in her mouth again. In addition, after returning to the van, he went immediately to the back and picked up the victim's dress and later used it to rub the driver's door and wipe off his fingerprints. Although he testified the victim's eyes were open, he denied that they were wide open, as shown in one of the crime scene photographs. He admitted that he did not know if the victim was still breathing and she could have been dead. He also admitted that after she went limp, he never saw her move again. He denied seeing the skinned places on her knees or any bruises on her arm and stated that she had not fallen in his presence. He also insisted that he did not intend to hide any evidence but "just throwed them away."

The State presented rebuttal evidence tending to show that the victim was not a flirtatious person or one who had a reputation for infidelity and that she cared deeply for her family. Alan Crews testified that he and the victim began to date each other exclusively before their seventeenth birthdays, and this continued until their marriage in 1982, just after they graduated from college. To his knowledge, his wife had always been faithful to him, and she had an aversion to oral sex.

At the close of all the evidence defendant renewed his motion to dismiss the charges against him, and the court denied the motion. The jury found defendant guilty on all counts as charged. Evidence

STATE v. SEXTON

[336 N.C. 321 (1994)]

relative to the sentencing proceeding will be discussed later in this opinion.

JURY SELECTION ISSUES

[1] Defendant first contends that the trial court committed reversible error by permitting the prosecutor to exercise peremptory challenges on the basis of race in violation of *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986). Defendant argues that in evaluating his *Batson* claim, the trial court applied the wrong legal standard and improperly placed on defendant the burden to show that jurors were excluded solely because of their race. Defendant argues further that the trial court failed to make findings of fact. We do not find these arguments persuasive.

The Equal Protection Clause of the United States Constitution prohibits a prosecutor from challenging prospective jurors "solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson*, 476 U.S. at 89, 90 L. Ed. 2d at 83; *accord State v. Glenn*, 333 N.C. 296, 301-02, 425 S.E.2d 688, 692 (1993).

In *Hernandez v. New York*, 500 U.S. 352, 114 L. Ed. 2d 395 (1991), the Court summarized the *Batson* three-step process for evaluating such claims by a defendant:

First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Id.* at 358-59, 114 L. Ed. 2d at 405 (citations omitted). Further, once a prosecutor has offered race-neutral explanations "and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot." *Id.* at 359, 114 L. Ed. 2d at 405. An explanation based on something other than the race of the prospective juror constitutes a neutral explanation. *Id.* at 360, 114 L. Ed. 2d at 406. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* The reason offered by the prosecutor "need not

STATE v. SEXTON

[336 N.C. 321 (1994)]

rise to the level of a challenge for cause." *Id.* at 362-63, 114 L. Ed. 2d at 407-08; *accord State v. Robinson,* 330 N.C. 1, 17, 409 S.E.2d 288, 297 (1991). "Once the prosecutor offers a race-neutral basis for his exercise of peremptory challenges, '[t]he trial court then [has] the duty to determine if the defendant has established purposeful discrimination.'" *Id.* at 363, 114 L. Ed. 2d at 408 (quoting *Batson,* 476 U.S. at 98, 90 L. Ed. 2d at 88-89). "[T]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal." *Id.* at 364, 114 L. Ed. 2d at 408-09. "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Id.* at 365, 114 L. Ed. 2d at 409. "[E]valuation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" *Id.* (quoting *Wainwright v. Witt,* 469 U.S. 412, 428, 83 L. Ed. 2d 841, 854 (1985)).

Applying these principles, we note first that the record includes a two-page order containing the trial court's findings of fact and conclusions of law on defendant's *Batson* claim. The trial court noted that it "did not determine that the defendant had made a prima facie case to raise an inference that the District Attorney used the challenges to exclude prospective jurors from the trial jury because of their race[,] but the District Attorney did explain the reasons for using a peremptory challenge as to each black juror excused." As to each such juror, the court's findings restate the prosecutor's reasons:

(a) . . . Juror #9 [Badger]. She changed her view of the death penalty several times during voir dire

(b) . . . Juror #5. She made no eye contact with the District Attorney during voir dire. On her questionnaire she listed that her brother was in prison. She also knew defendant's witness Myra Norwood.

(c) . . . Juror #9 [Alston]. He wore an earring, was 22 years old and was not employed.

(d) . . . Juror #1. Her husband works for a hospital as did the defendant prior to arrest. Some member of her family had been arrested for child support.

The court concluded that the challenges were for race-neutral reasons and there was no purposeful racial discrimination or violation of the Equal Protection Clause.

Under *Hernandez*, the trial court could also have considered whether the prosecutor's stated basis for a peremptory challenge would result in the disproportionate exclusion of members of a certain race. *Id.* at 363, 114 L. Ed. 2d at 408. We note that the venire consisted of seventy-nine whites and six blacks; and at the time of defendant's challenge, the prosecutor had exercised five peremptory challenges, the first against a white and the next four against blacks. The findings quoted above show that the prosecutor did not excuse all four blacks for the same reason and the reasons given were race-neutral. The trial court also found that (seated) Juror 12 and Alternate Juror 2 were members of the black race.

From the record, this Court cannot conclude there was disproportionate exclusion of members of the black race. Moreover, the trial court's conclusion that there was no purposeful racial discrimination by the prosecutor rests upon the court's evaluation of the prosecutor's demeanor and credibility. Therefore, we hold the trial court did not err in overruling defendant's objections.

[2]    Defendant also contends the trial court erred by denying him the opportunity to examine prospective jurors on parole eligibility and refusing to submit to the jury mitigating circumstances relating to parole. We disagree.

In *State v. Robbins*, 319 N.C. 465, 356 S.E.2d 279, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987), this Court said:

> Defendant correctly observes that this Court has consistently held that a criminal defendant's status under the parole laws is irrelevant to a sentencing determination, and, as such, cannot be considered by the jury during sentencing, whether in a capital sentencing procedure under N.C.G.S. § 15A-2000 or in an ordinary case. *State v. Brown*, 306 N.C. 151, 293 S.E.2d 569, *cert. denied*, 459 U.S. 1080, 74 L. Ed. 2d 642 (1982); *State v. Jones*, 296 N.C. 495, 251 S.E.2d 425 (1979).

*Id.* at 518, 356 S.E.2d at 310.

In the instant case, defendant makes essentially the same arguments as those in *Robbins*. Defendant also relies on *California v. Ramos*, 463 U.S. 992, 77 L. Ed. 2d 1171 (1983), wherein the

Court found no constitutional defect in a California law requiring the trial court to inform a capital sentencing jury that the governor possessed power to commute a sentence of life imprisonment without possibility of parole. However, in *Robbins* this Court explicitly rejected the argument that such an instruction is constitutionally required. 319 N.C. at 519, 356 S.E.2d at 311. More recently, in *State v. Lee*, 335 N.C. 244, 439 S.E.2d 547 (1994), this Court addressed the issue as follows:

> A trial judge has broad discretion to regulate jury *voir dire*. *State v. Artis*, 325 N.C. 278, 384 S.E.2d 470 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990); *State v. Johnson*, 317 N.C. 343, 346 S.E.2d 596 (1986). In order for a defendant to show reversible error in the trial court's regulation of jury selection, a defendant must show that the court abused its discretion and that he was prejudiced thereby. *Id.*
>
> As we held above, the subject of parole eligibility and the meaning of "life imprisonment" are irrelevant to the issues to be determined during the sentencing proceeding. *State v. McNeil*, 324 N.C. 33, 375 S.E.2d 909. The trial court did not abuse its discretion by refusing to allow the defendant to question jurors regarding these subjects.

*Id.* at 268, 439 S.E.2d at 559. Following *Robbins* and *Lee*, we hold the trial court did not err in refusing to permit defense counsel to raise these issues during jury selection or in refusing to submit mitigating circumstances based thereon.

**[3]** Defendant next contends the trial court erred in granting the State's challenges for cause of prospective jurors Jones and Hayes based on their feelings about the death penalty. Again, we disagree.

> The standard for determining whether a prospective juror may be properly excused for cause for his views on capital punishment is whether those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985); *accord, State v. Davis*, 325 N.C. 607, 621-22, 386 S.E.2d 418, 425 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990).

*State v. Syriani*, 333 N.C. 350, 369-70, 428 S.E.2d 118, 128, *cert. denied*, --- U.S. ---, 126 L. Ed. 2d 341 (1993); *see also State v.*

*Brogden*, 334 N.C. 39, 42, 430 S.E.2d 905, 907 (1993) (reiterating *Witt* standard). In addition, "[j]urors must be able to ' "*state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.*' " *Brogden*, 334 N.C. at 43, 430 S.E.2d at 907-908 (alteration in original) (quoting *Lockhart v. McCree*, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149 (1986) )." *State v. Gibbs*, 335 N.C. 1, 29, 436 S.E.2d 321, 337 (1993).

In the instant case, the record shows that when questioned by the prosecutor, Jones said he strongly opposed the death penalty. Asked twice if his feeling would substantially impair his ability to recommend death, Jones twice replied, "Yes." After a lengthy explanation by defense counsel, the court asked Jones if his personal convictions about the death penalty would prevent or substantially impair the performance of his duty in accordance with the court's instructions and Jones' oath. Jones answered, "I believe, it would hinder me from, because I have definite doubts about the death penalty."

When questioned by the prosecutor, prospective juror Hayes stated that she did not approve of the death penalty. Asked if she thought the appropriate punishment in all first-degree murder cases should be life, rather than death, she answered, "Yes, life rather than death." She heard defense counsel's lengthy explanation to Jones; and when questioned by the trial court, she answered twice that her personal convictions about the death penalty would substantially impair the performance of her duty.

> Where a person's responses reveal he does not believe in the death penalty and that his belief would interfere with the performance of his duty at the guilt-innocence or sentencing phase, these responses demonstrate that he cannot fulfill the obligations of a juror's oath to follow the law in carrying out his duties as a juror; and the trial court does not err in excusing him for cause. *Syriani*, 333 N.C. at 371, 428 S.E.2d at 129.

*Id.* at 29, 436 S.E.2d at 337.

Applying the foregoing principles, we conclude the trial court did not err in granting the prosecutor's challenges for cause of prospective jurors Jones and Hayes.

[4] Defendant also contends the trial court erred in denying his challenge for cause of prospective juror Iler, who, defendant argues, expressed a predisposition to impose the death penalty and thus

STATE v. SEXTON

[336 N.C. 321 (1994)]

was unable to follow his oath to consider both life and death. Iler was passed by the State, and when questioned by the defense, at first seemed to indicate he could not consider a life sentence. However, when questioned further, Iler indicated he had not understood the bifurcation procedure. He next said he could consider life imprisonment but later said he could not. However, the trial court asked, "[C]an you fairly consider both and make a decision or is your view that you cannot consider life imprisonment?" Iler responded, "I could do that, yes." Then he added, "I said, no, but I could do that if certain evidence is presented to go along." Questioned again by defense counsel, Iler stated four times that he could compromise his feelings in order to arrive at the point where he could consider life imprisonment as a punishment. Without again challenging Iler for cause, defense counsel exercised a peremptory challenge to remove him.

In *State v. Quesinberry*, 319 N.C. 228, 354 S.E.2d 446 (1987), the defendant made a similar contention. Defendant Quesinberry argued that the trial court erred in refusing to remove for cause a prospective juror who "expressed his belief that every murderer should receive the death sentence; but upon assuring the trial court that he could and would follow the court's instructions and remain open-minded regarding the appropriate sentence, he was seated as a juror." *Id.* at 235, 354 S.E.2d at 450. The Court concluded that since the prospective juror said he could put aside his prejudice concerning the death penalty, "[u]nder the *Adams-Witt* standard, [he] was properly not excused for cause." *Id.* at 235, 354 S.E.2d at 451.

In the instant case, Iler indicated he could put aside his leaning towards the death penalty. Following *Quesinberry*, we conclude the trial court did not err in refusing to remove Iler upon defendant's challenge for cause.

Defendant next contends the trial court abused its discretion in the conduct of jury selection. Defendant first argues that in four instances the trial court erred in permitting questions and statements by the prosecutor which misrepresented the law or a juror's duty. In two instances defendant objected, the trial court instructed the prosecutor to rephrase his questions, and the prosecutor did so. In two other instances defendant contends the court should have intervened *ex mero motu*. After a careful review of the record, we find the prosecutor did not misrepresent the law. Since there was no gross impropriety, we conclude the trial court

did not err in failing to intervene. *See State v. Gibbs*, 335 N.C. at 39, 436 S.E.2d at 342 (stating that where defendant fails to object to prosecutor's statements or comments during jury selection, gross impropriety is the standard of review).

[5] In addition defendant argues that the trial court improperly denied his request for individual *voir dire* of jurors who recalled media reports of the crimes. We are not persuaded by defendant's argument.

The Criminal Procedure Act provides that in capital cases the trial court "may direct that jurors be selected one at a time." N.C.G.S. § 15A-1214(j) (1988). "This statute gives neither party an absolute right to such a procedure." *State v. Murphy*, 321 N.C. 738, 740, 365 S.E.2d 615, 617 (1988). Instead, whether to grant individual *voir dire* is within the sound discretion of the trial court, whose ruling will not be disturbed on appeal absent a showing of abuse of discretion. *Id.*

The jury selection process in defendant's case was lengthy and consumes over 900 pages of the transcript. Early in the process, the prosecutor asked a panel of twelve jurors to raise their hands if they recalled media coverage of the case. The prosecutor noted, "That's almost everybody on the jury," and suggested to the court that individual questioning might be appropriate. Court was recessed for lunch, and immediately after it reconvened, defense counsel expressed concern "that somebody might have a strong opinion about" the case on account of publicity "and might poison those in the box and out in the audience, too." The court said as follows:

> Well, unless somebody asks them what they have read, which you are not suppose[d] to do, I think you can handle it by proper questions. If it gets too bad, then I will find some way to move everybody out[,] but I think with the right kind of questions[,] you can hold that down. Let's just see. If it gets too bad, we will have to send them out and just take them one at a time. We may have to.

At no other time during jury selection did defense counsel specifically request individual *voir dire*. Defendant has failed to show abuse of discretion, and finding none, we conclude the trial court did not err.

GUILT-INNOCENCE PHASE ISSUES

[6] Defendant's first contention is that the trial court committed plain error when it allowed the State to introduce into evidence

defendant's statement to Detective Howard summarized above. Defendant concedes that he neither moved to suppress nor objected to admission of the statement. We find defendant has waived his right to object to its admission.

In *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987), this Court addressed a similar contention. We held that defendant's failure to object at trial to the admission of his statement waived any right to raise the issue on appeal. *Id.* at 14, 352 S.E.2d at 660. The statement provided

> the only evidentiary basis for defendant's principal defense against imposition of the death penalty. Under these circumstances it is imperative that defendant decide at trial whether he wants the statement admitted or not. It is a tactical decision that can only be made by defendant, not the court. A defendant may not, for tactical reasons, fail to object at trial to evidence he hopes will help him and later on appeal assign admission of that evidence as error when in light of the jury's verdict the evidence was not helpful, or was even hurtful, to defendant. The waiver rule was designed precisely to prevent this kind of second-guessing of the probable impact of evidence on the jury by parties who lose at the trial level. Defendant made his tactical decision to let the evidence come in at trial without objection. He may not now be heard to complain.

*Id.* at 15, 352 S.E.2d at 661.

In the instant case, defendant's defense to the charges of kidnapping, rape, and sexual offense was consent. The statement to Detective Howard, if believed, tended to bolster defendant's trial testimony that the victim found him attractive, consented to accompany and have sex with him, and later changed her mind. The defense of consent tended further to defeat a conviction of murder on the basis of felony murder.

In addition, defendant's defense to the charge of first-degree murder was lack of specific intent to kill formed after premeditation and deliberation. The statement to Detective Howard tended to bolster defendant's trial testimony that after the victim changed her mind, everything happened very fast; he thought the victim was alive when he left her; and on the next day he was shocked to find out she was dead. At trial defendant explained that after

STATE v. SEXTON

[336 N.C. 321 (1994)]

he learned of the victim's death, he knew he was in trouble. Fearing he would get into more trouble, he did not tell Howard about having consensual sex with her.

Defendant's credibility was an essential element of his defenses. Evidence that prior to trial he made a statement consistent with the defenses raised at trial tended to bolster his credibility, and, consequently, his defenses. Defendant also gained advantage from having his explanation of the events put before the jury during State's case in chief. Defendant's case differs slightly from *Stokes* in that his testimony provided a partial evidentiary basis for his principal defenses against the death penalty. The record shows, however, that defendant made a tactical decision to let the prior statement come in at trial without objection. Hence, he may not now be heard to complain. Following *Stokes*, we conclude defendant waived the right to argue error, if any, on appeal.

[7] Defendant next contends the trial court erred in admitting over his objection State's Exhibit 43, an enlarged color photograph of the victim's naked body taken at the crime scene. Defendant argues use of the photograph was intended solely to and had the sole effect of inflaming the jury's passion and prejudice against him. We do not find these arguments persuasive.

" 'Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury.' " *State v. Robinson*, 327 N.C. 346, 356, 395 S.E.2d 402, 408 (1990) (quoting *State v. Hennis*, 323 N.C. 279, 284, 372 S.E.2d 523, 526 (1988) ). In *State v. Harris*, 323 N.C. 112, 371 S.E.2d 689 (1988), this Court considered whether a single color photograph of the victim's remains was improperly admitted. We reiterated that "in a homicide case, photographs showing the condition of the body and its location when found are competent in spite of their portrayal of a gruesome spectacle." *Id.* at 127, 371 S.E.2d at 698. Whether photographic evidence is more probative than prejudicial lies within the trial court's discretion. " 'Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.' " *Robinson*, 327 N.C. at 357, 395 S.E.2d at 408 (quoting *Hennis*, 323 N.C. at 285, 372 S.E.2d at 526-27).

STATE v. SEXTON

[336 N.C. 321 (1994)]

In the instant case, the challenged photograph was used by Agent Worsham, who observed the body at the crime scene, to illustrate his testimony about the location of defendant's hairs recovered from the victim's body. In addition, Agent Spittle, who also observed the body at the scene, used the photograph to illustrate his testimony about body areas from which he took swabs and to show that the victim's hair was soaking wet. The photograph was not passed to the jury.

"Because the [S]tate introduced only one photograph of the victim's body, no issue of inflammatory repetition arises." *Harris*, 323 N.C. at 127, 371 S.E.2d at 698. In *Robinson*, this Court stated that in only a few cases have we held the use of photographic evidence to be unfairly prejudicial. 327 N.C. at 357, 395 S.E.2d at 409 (citing *Hennis* and *State v. Mercer*, 275 N.C. 108, 165 S.E.2d 328 (1969), *overruled on other grounds by State v. Caddell*, 287 N.C. 266, 215 S.E.2d 348 (1975)).

Applying the foregoing principles, we cannot say that in the instant case, the trial court's decision to admit the photograph was manifestly unsupported by reason. The photograph, although enlarged, was used for illustrative purposes but not to excess. *Cf. Hennis*, 323 N.C. at 286, 372 S.E.2d at 528 (finding excessive use where evidence included thirty-five photographs passed to the jury and slides thereof were projected onto a screen whose dimensions were three feet and ten inches by five feet and six inches). We conclude, therefore, that the trial court did not err in admitting the photograph.

Defendant next contends the trial court committed plain error in permitting the prosecutor to cross-examine defendant regarding other crimes, bad acts, and character issues in order to suggest defendant had a violent and criminal predisposition. Again, we disagree.

[8] Defendant first argues that the trial court erred in permitting the prosecutor to inquire into specific details of his assault on Angela. Defendant concedes that during cross-examination, the prosecutor properly questioned defendant about his past convictions. Defendant argues that the prosecutor should not have been allowed to ask if defendant choked Angela.

Recently in *State v. Lynch*, 334 N.C. 402, 432 S.E.2d 349 (1993), this Court reaffirmed the rule "prohibiting the State from eliciting

STATE v. SEXTON

[336 N.C. 321 (1994)]

details of prior convictions other than the name of the crime and the time, place, and punishment for impeachment purposes under Rule 609(a) in the guilt-innocence phase of a criminal trial." 334 N.C. at 410, 432 S.E.2d at 353. However, we also discussed certain exceptions to this exclusionary rule and reiterated that Rule 404(b) operates as a general rule of inclusion for evidence of other crimes, wrongs, or acts if offered for a proper purpose, *e.g.*, proof of intent. Rule 404(b) excludes only evidence probative solely of a defendant's character or propensity to commit crimes. "The admissibility of evidence under this rule is guided by two further constraints — similarity and temporal proximity." *Id.* at 412, 432 S.E.2d at 354. On the facts then before us, we could not

> discern any logical relationship between the details of the prior crimes brought out on cross-examination and the crimes charged. That the defendant had used various weapons in other crimes had no bearing on any element of the offenses for which he was being tried, and the 1985 assault incidents involving Shirley Sutton and Wesley Hall were not only remote in time but were factually dissimilar from the present case.

*Id.*

The instant case differs from *Lynch* in that there is a logical relationship between the details of the prior crime and the murder charge, since both were committed by means of choking. Defendant testified he was not sure he choked Angela; and similarly, he could not recall details of his choking Kimberly Crews. As discussed above, defendant's defense to the murder charge was lack of specific intent to kill. That he had recently choked another victim was relevant to show intent. Finally, the prior assault by choking was not remote in time, having occurred in October 1989, less than a year before the occurrence of the murder with which defendant was charged. For all these reasons, the evidence was admissible under Rule 404(b) and was not precluded under Rule 609. Therefore, the trial court did not err in admitting it; and we conclude there was no plain error. *See State v. Torain*, 316 N.C. 111, 123, 340 S.E.2d 465, 468 (stating that error at trial is prerequisite to an appellate finding of plain error), *cert. denied*, 479 U.S. 836, 93 L. Ed. 2d 77 (1986).

[9] Defendant also argues that the trial court permitted the prosecutor to engage in other irrelevant and prejudicial cross-examination, including questions about whether defendant possessed a driver's

license, graduated from high school, or had consumed drugs at the time of the murder. Defendant contends that since defendant did not raise the defenses of intoxication, insanity, or diminished capacity, the inquiries show the prosecutor's improper attempt to convert the trial from a determination of what happened on 8 August 1990 to a referendum on defendant's character. However, State responds, and we agree, that these questions were relevant to show generally that defendant was a person of normal intelligence who was clearheaded at the time of the crimes. We note also that the statutory mitigating circumstance of diminished capacity was submitted at sentencing. Again, we conclude there was no error and thus no plain error.

Defendant's next two contentions relate to the State's rebuttal evidence. Defendant testified on his own behalf that the victim approached him in the parking lot, asked him if he was having car trouble, and offered him a ride to the security station. According to defendant, the victim let him into her van, and after they had exchanged names, the victim told him that he was a nice looking person and that she liked the way he looked. Defendant interpreted this as a come-on. Defendant further testified that the victim then asked him if she could touch him or rub his chest. Defendant asked her what she thought about cheating, and the victim replied that one had to cheat sometimes. The victim then agreed that she felt like cheating that evening. According to defendant's testimony the two then drove to Galahad Street and parked. Defendant asked the victim if she was ready, and the victim responded, "Yes." Then with no further conversation, the victim walked to the back of the van and began to take her clothes off. Defendant stood in front of the victim, and the victim began to rub his chest and penis. According to defendant the victim then put defendant's penis in her mouth. After this the victim lay down on the seat, and again with no conversation, she and defendant had sexual intercourse.

In rebuttal, the State presented the testimony of Dr. David Ingram, Dr. Vivian Everett, Ms. Pauline Lyna, Ms. Nancy Mabry, all of whom worked with the victim, and Mr. Alan Crews, the victim's husband. The prosecutor asked Ingram, Everett, Lyna, and Mabry whether the victim was flirtatious or had a reputation for being flirtatious and also about the victim's reputation as a family person. These witnesses' testimony was consistent that the victim was not flirtatious and was a strong family person. Addi-

STATE v. SEXTON

[336 N.C. 321 (1994)]

tionally, Everett and Lyna were asked whether the victim ever discussed going out with other men or cheating on her husband. Both witnesses answered these questions negatively. The victim's husband testified that to his knowledge the victim had never cheated on him and that the victim had an aversion to oral sex.

[10] Defendant first contends that the evidence about the victim's past sexual behavior and reputation for marital fidelity was introduced in violation of the rape shield statute.[1] Defendant argues

---

1. The statute provides as follows:

**Rule 412.  Rape or sex offense cases; relevance of victim's past behavior.**

(a) As used in this rule, the term "sexual behavior" means sexual activity of the complainant other than the sexual act which is at issue in the indictment on trial.

(b) Notwithstanding any other provision of law, the sexual behavior of the complainant is irrelevant to any issue in the prosecution unless such behavior:

(1) Was between the complainant and the defendant; or

(2) Is evidence of specific instances of sexual behavior offered for the purpose of showing that the act or acts charged were not committed by the defendant; or

(3) Is evidence of a pattern of sexual behavior so distinctive and so closely resembling the defendant's version of the alleged encounter with the complainant as to tend to prove that such complainant consented to the act or acts charged or behaved in such a manner as to lead the defendant reasonably to believe that the complainant consented; or

(4) Is evidence of sexual behavior offered as the basis of expert psychological or psychiatric opinion that the complainant fantasized or invented the act or acts charged.

(c) Sexual behavior otherwise admissible under this rule may not be proved by reputation or opinion.

(d) Notwithstanding any other provision of law, unless and until the court determines that evidence of sexual behavior is relevant under subdivision (b), no reference to this behavior may be made in the presence of the jury and no evidence of this behavior may be introduced at any time during the trial of:

(1) A charge of rape or a lesser included offense of rape;

(2) A charge of a sex offense or a lesser included offense of a sex offense; or

(3) An offense being tried jointly with a charge of rape or a sex offense, or with a lesser included offense of rape or a sex offense.

that the evidence was prohibited by the policies set forth in *State v. Fortney*, 301 N.C. 31, 269 S.E.2d 110 (1980), and was not within the scope of *State v. Stanton*, 319 N.C. 180, 353 S.E.2d 385 (1987).

Initially we note that while defendant objected when questions about the victim's flirtatiousness and attitude towards family were asked of certain witnesses, defendant failed to object when the same or similar questions were asked of another witness. Consequently, the same evidence or evidence of similar import was admitted without objection. "When evidence is admitted over objection and the same evidence has been previously admitted or is later admitted without objection, as here, the benefit of the objection is lost." *State v. Morgan*, 315 N.C. 626, 641, 340 S.E.2d 84, 94 (1986). Defendant also did not object when Everett, Lyna, and Crews were asked about the victim's marital fidelity or when Crews was asked about the victim's attitude concerning oral sex. Hence, in order to obtain any relief, defendant must show that error, if any, constituted plain error. *See State v. Syriani*, 333 N.C. 350, 376, 428 S.E.2d 118, 132 (1993).

---

Before any questions pertaining to such evidence are asked of any witness, the proponent of such evidence shall first apply to the court for a determination of the relevance of the sexual behavior to which it relates. The proponent of such evidence may make application either prior to trial pursuant to G.S. 15A-952, or during the trial at the time when the proponent desires to introduce such evidence. When application is made, the court shall conduct an in camera hearing, which shall be transcribed, to consider the proponent's offer of proof and the argument of counsel, including any counsel for the complainant, to determine the extent to which such behavior is relevant. In the hearing, the proponent of the evidence shall establish the basis of admissibility of such evidence. Notwithstanding subdivision (b) of Rule 104, if the relevancy of the evidence which the proponent seeks to offer in the trial depends upon the fulfillment of a condition of fact, the court, at the in camera hearing or at a subsequent in camera hearing scheduled for that purpose, shall accept evidence on the issue of whether that condition of fact is fulfilled and shall determine that issue. If the court finds that the evidence is relevant, it shall enter an order stating that the evidence may be admitted and the nature of the questions which will be permitted.

(e) The record of the in camera hearing and all evidence relating thereto shall be open to inspection only by the parties, the complainant, their attorneys and the court and its agents, and shall be used only as necessary for appellate review. At any probable cause hearing, the judge shall take cognizance of the evidence, if admissible, at the end of the in camera hearing without the questions being repeated or the evidence being resubmitted in open court.

N.C.G.S. § 8C-1, Rule 412 (1992).

We find that the policies articulated in *Fortney* do not support defendant's contention. *Fortney* was decided under the former rape shield statute, N.C.G.S. § 8-58.6 (1981). The defendant argued that · because the statute prevented him from automatically questioning the prosecuting witness about her prior sexual experience, his right to confront the witness against him was compromised. *Fortney*, 301 N.C. at 35, 269 S.E.2d at 112. Discussing the policy reasons supporting the statute, this Court characterized it as a special rule of relevancy designed to (i) protect a rape victim from questions which go beyond the bounds of proper cross-examination merely to harass, annoy, or humiliate her, *id.* at 36, 269 S.E.2d at 113; (ii) reject "[t]he idea that *any* previous sexual behavior of a rape victim is *per se* relevant to a rape proceeding," *id.* at 38, 269 S.E.2d at 113-14; (iii) eliminate "the much more probable result of prejudice to the State's case when such evidence is admitted," *id.* at 38, 269 S.E.2d at 114; (iv) prevent diversion of the jury's attention to collateral issues, *id.* at 39, 269 S.E.2d at 114; and (v) eliminate victims' reluctance to report and prosecute sexual assaults, since such reluctance "stems from their feeling that the legal system harasses and humiliates them," *id.* at 42, 269 S.E.2d at 116. *See also* 2 David W. Louisell, *Federal Evidence* § 196 (rev. ed. 1985) [hereinafter 2 Louisell, *Federal Evidence*] (stating that debate over federal Rule 412 showed congressional concern over embarrassment and humiliation suffered by rape complainants and concern to insure that privacy of the complainant was protected).

*Stanton* was decided under the current rape shield statute. Defendant argued

> that the trial judge committed reversible error by permitting the victim to testify, over objection, that she became pregnant and had an abortion subsequent to the rape [and] it was plain error for the trial judge to permit the victim to testify, even in the absence of any objection, that she was not having sexual intercourse with anyone else during that time.

*Stanton*, 319 N.C. at 183, 353 S.E.2d at 387-88. Rejecting defendant's second contention, we said:

> Defendant contends that the admission of this evidence somehow violates Rule 412. With certain exceptions not pertinent here, Rule 412 is the embodiment of its predecessor, N.C.G.S. § 8-58.6 (repealed by 1983 N.C. Sess. Laws (Regular Sess. 1984) ch. 1037, § 2 (effective 1 July 1984) ), a part of

what was commonly referred to as the Rape Shield Law. De-
fendant's failure to object at trial aside, we find no error in
the admission of this evidence. Defendant cites no authority
contrary to either Rule 412 or its predecessor statute, N.C.G.S.
§ 8-58.6, to prohibit a victim from willingly testifying as to
the lack of sexual involvement for purposes of corroboration,
and we decline to so construe it. It would strain credulity
for this Court to hold that, while a victim may testify to the
details of her rape and corroborate that testimony with further
testimony concerning her pregnancy and subsequent abortion,
she may not testify as to the lack of sexual involvement with
anyone except the defendant and thereby fail to fix respon-
sibility for the pregnancy on the defendant.

*Id.* at 187, 353 S.E.2d at 389-90. Although concurring in the Court's
ultimate decision, Justice Frye, joined by Chief Justice Exum and
Justice Mitchell, agreed only that admission of the evidence did
not constitute plain error, since Rule 412 made "this type of evidence
irrelevant to any issue in this case and its admission improper
if properly objected to." *Id.* at 191, 353 S.E.2d at 392. Even though
the evidence related to a lack of sexual activity, rather than sexual
activity,

one purpose of the rule is to remove from the prosecution
of sex offense cases the question of the prosecutrix's sexual
activity or lack thereof with persons other than the defendant.
Once the complaining witness is permitted to testify, as here,
that she was neither dating anyone on a regular basis nor
having sexual intercourse with anyone during that time, the
door is open for defendant to make an issue of her sexual
behavior. This, in my opinion, is what Rule 412 attempts to
prevent.

*Id.* at 192, 353 S.E.2d at 392.

One patent and significant difference between *Fortney* and
*Stanton* and the instant case is that the sexual assault victim herein,
Kimberly Crews, was dead and could neither rebut the defense
of consent nor risk subjecting herself to possible cross-examination
about her previous sexual behavior. Therefore, the policies designed
to protect rape victims personally and which support a conclusion
that previous sexual behavior must in every instance be deemed
irrelevant to prosecution of sexual assaults are of less importance.
In addition, the instant case differs further from *Stanton* in that

STATE v. SEXTON

[336 N.C. 321 (1994)]

the State did not attempt in its case in chief to introduce evidence of Kimberly Crews' previous sexual behavior. Therefore, permitting this rebuttal evidence does not conflict with the underlying statutory policy of eliminating prejudice to the State's case caused by introducing evidence of the victim's unfavorable personal characteristics or the policy that the issue of the victim's character is a collateral one. As the policy discussion in *Fortney* makes clear, the statute was intended as a shield for the victims of sexual assault and not as a sword for defendants. Therefore, we hold that in the limited circumstance where the rape victim is deceased and the defendant's own testimony brings into question the victim's sexual behavior, the prosecution may present rebuttal evidence relating to the victim's prior sexual conduct to challenge the credibility of defendant's testimony. In sum, we conclude that on the peculiar facts of the instant case, there was no error, hence there could be no plain error.

[11] Defendant also contends the trial court erred in permitting the rebuttal testimony about the victim's general good moral character, devotion to family, and reputation for marital fidelity. Defendant argues that the general rule is that evidence of a victim's character cannot be introduced to prove that she acted in accord therewith, but acknowledges that an exception exists for character evidence introduced to rebut defense evidence which puts it at issue. Defendant contends, however, that he did not introduce any evidence which permitted rebuttal evidence of the victim's good character; therefore, the evidence was erroneously admitted to defendant's prejudice. We do not find defendant's arguments persuasive.

Rule 404 prohibits the admission of evidence of a person's character offered for the purpose of proving conduct in conformity therewith. N.C.G.S. § 8C-1, Rule 404(a) (1992). An exception exists for evidence of a pertinent trait of character of the victim if offered by the accused "or by the prosecution to rebut the same." N.C.G.S. § 8C-1, Rule 404(a)(2). "Pertinent" means " 'relevant in the context of the crime charged.' " *State v. Bogle*, 324 N.C. 190, 198, 376 S.E.2d 745, 749 (1989) (quoting *State v. Squire*, 321 N.C. 541, 548, 364 S.E.2d 354, 358 (1988), and construing Rule 404(a)(1), which applies to the accused). "In criminal cases, in order to be admissible as a 'pertinent' trait of character, the trait must *bear a special relationship to* or *be involved in* the crime charged." *Id.* at 201, 376 S.E.2d at 751. For example, if one were charged with a crime

of violence, character for peaceableness would be pertinent; and if charged with embezzlement, honesty would be pertinent. "Rule 404(a), as a general rule, excludes character evidence. Therefore, the language of its exception permitting the accused to offer evidence of a 'pertinent' trait should be restrictively construed." *Id.* Following these principles, to be pertinent, a character trait of the victim must bear a relationship to the crime with which the defendant is charged. For example, if the defendant's defense to murder is self-defense, character of the victim for violence is pertinent. *E.g., State v. Shoemaker*, 80 N.C. App. 95, 341 S.E.2d 603, *disc. rev. denied*, 317 N.C. 340, 346 S.E.2d 145 (1986).

In the instant case, defendant's testimony was that the victim was the instigator of the consensual sexual acts. His defense to the rape and sexual assault charges went beyond consent, however, when he testified that the victim stated positively that she wanted to cheat on her husband. Ordinarily, the exception created by Rule 404(a)(2) "applies to all kinds of prosecutions, except those for 'rape' or 'assault with intent to commit' rape, where the question of admitting evidence of the character of the complaining witness is governed by Rule 412." 2 Louisell, *Federal Evidence* § 139. Notwithstanding, by attacking the victim's character for marital fidelity, defendant went beyond what was necessary for his defense and opened the door to the rebuttal evidence. Opening the door refers to the principle that where one party introduces evidence of a particular fact, the opposing party is entitled to introduce evidence in explanation or rebuttal thereof, even though the rebuttal evidence would be incompetent or irrelevant had it been offered initially. *State v. Rose*, 335 N.C. 301, 337, 439 S.E.2d 518, 538 (1994). Therefore, we hold the trial court did not err in admitting the evidence.

[12] Defendant next contends the trial court erred in denying his motion, made at the close of all the evidence, to dismiss the charge of kidnapping. Defendant argues there was no evidence of forcible removal of the victim; the only viable theory was that defendant induced the victim to drive him from the parking lot to the scene of the murder; and the indictment limited the prosecution to a removal theory of kidnapping. We do not find these arguments persuasive.

The applicable statute provides in pertinent part:

Any person who shall unlawfully confine, restrain, or remove from one place to another, any other person 16 years of age or over without the consent of such person, or any other person under the age of 16 years without the consent of a parent or legal custodian of such person, shall be guilty of kidnapping if such confinement, restraint or removal is for the purpose of:

. . . .

Facilitating the commission of any felony or facilitating flight of any person following the commission of a felony; . . .

N.C.G.S. § 14-39(a)(2) (1986). " 'The use of actual physical force or violence is not always essential to the commission of the offense of kidnapping.' " *State v. Penley*, 277 N.C. 704, 707, 178 S.E.2d 490, 491 (1971) (quoting *State v. Bruce*, 268 N.C. 174, 182, 150 S.E.2d 216, 223 (1966)). Threats and intimidation are equivalent to the use of actual force or violence. *State v. Sturdivant*, 304 N.C. 293, 304, 283 S.E.2d 719, 729 (1981).

In ruling on a motion to dismiss, the trial court need only determine whether there is substantial evidence of each essential element of the offense charged and of defendant's being the perpetrator of the crime. *State v. Earnhardt*, 307 N.C. 62, 65, 296 S.E.2d 649, 651 (1982). Whether the evidence presented constitutes substantial evidence is a question of law for the trial court. *Id.* at 66, 296 S.E.2d at 652. "Substantial evidence" simply means "that the evidence must be existing and real, not just seeming or imaginary." *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980). The trial court's function is to determine whether the evidence permits a reasonable inference that the defendant is guilty of the crime charged. *Earnhardt*, 307 N.C. at 67, 296 S.E.2d at 652. In addition, "all evidence admitted, whether competent or incompetent, must be considered in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from the evidence and resolving in its favor any contradictions in the evidence." *State v. Williams*, 334 N.C. 440, 447, 434 S.E.2d 588, 592 (1993).

In the instant case, there was ample evidence to show defendant forcibly removed the victim from the parking lot. The victim was carrying her handbag, a portfolio containing books, and her open umbrella. Her umbrella, open, upside down, and containing

water, was observed shortly before 6:00 p.m. in the parking lot. In addition, evidence showed the victim's shoe tops bore striate scratches, and the knee areas of her panty hose had striate holes. Her body had scrapes on both knees and near the right elbow. She also had a deep bruise, consistent with a defensive wound, on her forearm and scrapes on her right cheek and under her nose. She had no scrapes or bruises in her mouth area at 4:30 p.m. on that afternoon. Viewed in the light most favorable to the State, this evidence was more than sufficient to raise an inference that the victim was forcibly removed across the parking lot to the van and then to Galahad Street. In addition, defendant testified that when he first saw the victim, he was holding the screwdriver he habitually used to start Angela's car. This evidence, viewed most favorably for the State, would support an inference that defendant removed the victim from the parking lot by threats and intimidation, the equivalent of force. Therefore, we conclude the trial court did not err in denying defendant's motion to dismiss.

Defendant next contends that the trial court erred in failing to intervene *ex mero motu* during the prosecutor's closing argument. We disagree.

> "Prosecutors are granted wide latitude in the scope of their argument." *State v. Zuniga*, 320 N.C. 233, 253, 357 S.E.2d 898, 911, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987). "An attorney may, . . . on the basis of his analysis of the evidence, argue any position or conclusion with respect to a matter in issue." N.C.G.S. § 15A-1230(a) (1988). "A prosecutor's argument is not improper when it is consistent with the record and does not travel into the fields of conjecture or personal opinion." *State v. Zuniga*, 320 N.C. at 253, 357 S.E.2d at 911 . . . .

> . . . Unless the defendant objects, the trial court is not required to interfere *ex mero motu* unless the arguments " 'stray so far from the bounds of propriety as to impede the defendant's right to a fair trial.' " *State v. Harris*, 308 N.C. 159, 169, 301 S.E.2d 91, 98 (1983) (quoting *State v. Davis*, 305 N.C. 400, 421, 290 S.E.2d 574, 587 (1982) ).

*State v. Small*, 328 N.C. 175, 184-85, 400 S.E.2d 413, 418 (1991).

Defendant first argues that the prosecutor deliberately attempted to incite passion by telling the jurors not to be angry at defendant and by interweaving "concepts tinged with racial content" into the argument. Defendant admits, however, that race

STATE v. SEXTON

[336 N.C. 321 (1994)]

was not explicitly mentioned. We have carefully reviewed the prosecutor's statements cited by defendant and find nothing racial in nature therein. Moreover, the prosecutor told the jurors to base their decision on the evidence, not on anger.

[13] Defendant also argues that the prosecutor impermissibly personalized the victim's ordeal by arguing "that it would defy human nature for [the victim] to have volunteered to assist defendant and put herself in a position to have a consensual conversation with him." However, the record discloses that the prosecutor tied this assertion to the evidence that it was raining heavily, the victim had called her husband to tell him she was leaving, and her umbrella was abandoned.

[14] Defendant also argues that the prosecutor inserted his opinion of defendant's credibility and sought to undermine the credibility of counsel by suggesting that they had orchestrated a slander. Among others, the prosecutor made the following statements to the jury: "Michael Sexton is a liar"; further, "[H]e's lied to you"; and finally, "He lied to Angela. He's lied to everybody. He's lied to you." These statements were not permissible. "It is improper for the district attorney, and defense counsel as well, to assert in his argument that a witness is lying. 'He can argue to the jury that they should not believe a witness, but he should not call him a liar.' " *State v. McKenna*, 289 N.C. 668, 686, 224 S.E.2d 537, 550 (1976) (quoting *State v. Miller*, 271 N.C. 646, 157 S.E.2d 335 (1967) ). While the statements constituted error, defendant has the burden of showing that the error was prejudicial. N.C.G.S. § 15A-1443(a) (1988). Defendant failed to object, and considering all the facts and circumstances revealed in the record which showed overwhelming evidence against defendant, defendant has failed to show that the error was prejudicial. Further, the prosecutor's mention of slander clearly referred to defendant's consent defense as a defense, not to the actions of defense counsel. Moreover, defendant again made no objection to the remark.

Defendant also contends that with respect to the kidnapping charge, the prosecutor argued critical facts not in evidence in a manner which deprived defendant of a fair trial. In support of this contention, defendant argues that the evidence failed to show removal by force. However, as we have previously concluded, ample evidence existed to support an inference that the victim was attacked outside her van.

STATE v. SEXTON

[336 N.C. 321 (1994)]

[15]    Defendant's final argument is that the prosecutor misstated the law on premeditation and deliberation. Defendant contends "[t]he prosecutor failed to tell the jury that defendant's anger, emotion and fear is irrelevant only if they the jury finds [sic] that 'the intent to kill was formed with a fixed purpose not under the influence of some suddenly aroused passion.'" On the evidence presented by the State, however, the prosecutor was entitled to urge the jury not to return a verdict of guilty of second-degree murder. Defendant also argues the prosecutor incorrectly stated that the judge would instruct "that [defendant] acted with deliberation." Although the prosecutor did not read the pattern instruction on premeditation and deliberation, he did use the conditional "if" throughout his remarks about premeditation and deliberation. Furthermore, the trial court gave the pattern instruction on premeditation and deliberation.

For all the foregoing reasons, we conclude defendant has failed to show that the prosecutor's argument was grossly improper. Therefore, we hold the trial court did not err in failing to intervene *ex mero motu*.

[16]    Defendant's next contention is that after he objected, the trial court erred by refusing to modify its instruction on the charge of kidnapping. Defendant argues that on the facts of his case, the court erred in instructing that consent obtained by fraud is not consent. Defendant concedes that removal of a victim from one place to another may be accomplished by means of fraud or fear but argues that the purpose of the fraud theory of kidnapping was to protect the young and feeble-minded against machinations of adults with criminal intentions. Defendant argues further that there were no fraudulent misrepresentations as contemplated by case law. We do not find these arguments persuasive.

"[T]he offense of kidnapping, as it is defined in G.S. 14-39, includes an unlawful restraint whereby one person's freedom of movement is restricted due to another's fraud or trickery." *State v. Sturdivant*, 304 N.C. 293, 307, 283 S.E.2d 719, 729 (1981). In *Sturdivant*, the Court found fraud where the defendant used the pretext of wanting a ride to a friend's home in order to enter the car of the victim, a married woman driving with her son. In *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983), the Court reaffirmed that false and fraudulent representations may constitute a substitute for force in kidnapping, but there was "no evidence

allowing more than mere conjecture that defendant used his misrepresentations to confine, restrain, or remove [the victim] against his will." *Id.* at 41, 305 S.E.2d at 714.

By contrast, in the instant case defendant stated in his confession that he first asked for a ride to the security office but then told the victim to drive down a road nearby because his cousin's car was there. Defendant admitted that he pretended his cousin's car was there. Defendant also said he thought the victim agreed to give him a ride because she saw his employee identification tag and thought it would be "O.K." to give him a ride. Considered altogether, defendant's evidence, if believed, sufficed to show trickery employed to accomplish removal as in *Sturdivant.* Therefore, we conclude the trial court did not err in instructing the jury as to kidnapping that consent obtained or induced by fraud or by fear is not consent.

## SENTENCING PROCEEDING ISSUES

In the sentencing proceeding the State resubmitted all evidence offered during the guilt-innocence phase and offered evidence consisting of the testimony of Probation-Parole Officer Stamer. Stamer testified that in May 1989 defendant was convicted of forgery and uttering; and in October 1989 he was convicted of two counts of assault on a female.

Defendant's evidence included testimony from several social workers and physicians. Myra Norwood, social worker with the Wake County Department of Social Services ("DSS"), testified that in July 1980 defendant and his younger brother and sister were placed in the custody of DSS because their alcoholic mother neglected them and permitted her alcoholic live-in boyfriend to beat them. The three children were found wandering the streets at night, and defendant and his brother were delinquent. When the case was assigned to Norwood, the mother had left the community, and she did not reappear until June 1982. Defendant was sent to a training school; no other treatment program or foster home could be found for him. Based on his aggression, Norwood recommended that he be included in the Willie M class, but he was not accepted "because he was not violent enough." From the training school defendant was sent to the Central Orphanage (now Central Children's Home); and Norwood continued to monitor his progress by consulting with Laverne Wortham, a social worker at the orphanage. Norwood testified that after a short period of good

behavior, defendant began to express anger and frustration and get into fights. Defendant also ran away from the orphanage. She recommended that defendant be encouraged to seek treatment at the Vance-Granville County Mental Health Center. Ordinarily, defendant was very reluctant to discuss his feelings. In June 1982, Norwood arranged for defendant's mother to see all three children at the orphanage, where defendant and his brother were staying. During the visit, which lasted about two hours, defendant would not look at or speak to his mother. Norwood testified that "he finally was able to tell her at the end that he was glad that she had come and that he was sometime[s] angry with her for just disappearing."

When defendant was discharged from the orphanage, he went to live with a foster family in Raleigh, and Norwood continued to monitor his progress. Defendant was about seventeen years old, was going to school, and seemed to be getting along well. Norwood's responsibility for defendant ended around the time he graduated from high school. In general, Norwood did not think defendant received the help he needed to resolve his behavioral problems. She thought more effective treatment was provided for his brother and sister.

Laverne Wortham, Program Administrator for the Central Children's Home, testified that she met defendant in 1981, when she was a social worker for the orphanage. According to a psychological evaluation prepared in July 1980, when defendant was thirteen years old, defendant's full scale IQ was 87. His overall intellectual ability was in the upper half of the dull normal range; he functioned cognitively as well or better than nineteen percent of the normal population for his age group. A discrepancy between his verbal and performance IQ levels showed that some process was disturbing his intellectual function. He appeared insecure, angry, and action oriented and had poor interpersonal problem-solving skills. Defendant stayed at the orphanage from March 1981 through November 1983. A summary report for 1981 showed that his initial behavior was good, but in October 1981 he was temporarily suspended for fighting. In November he left the orphanage but was picked up by the police and agreed to return. Defendant had a hard time expressing his feelings verbally, kept things inside him, and expressed his feelings by doing annoying things. He was referred to the local mental health clinic in January 1982. At that time he was experiencing some behavior problems at school, was repeating

ninth grade because of his low academic average, and was not putting much effort into his studies. Defendant's 1982 summary report indicated he had shown improvement "in areas of stealing, fighting, and walking off campus without permission." His school behavior also improved, but he continued to have difficulty expressing his feelings verbally. Defendant was "getting more difficult to work with because of this." His houseparent stated he was sneaky; she had to watch him constantly; and she was not comfortable around him because of the way he looked at her. Defendant "discontinued going to mental health in May, 1982, and again in October, '82. This was due to his not wanting to go and his refusal to attend the session." In September 1982 he allegedly stole another student's earphones and was arrested. Eventually he was charged with communicating threats to a houseparent and spent five days in jail. Later he was permitted to return to the orphanage. In 1983 he became hostile to staff and did not follow instructions or do what was asked of him. In January 1983 he and some other students killed some baby pigs they had been assigned to feed. In September he threatened to hit a housemother who asked him to turn down the volume of his radio. He continued to refuse to go to the mental health clinic. The staff questioned whether the orphanage could best meet his needs, as he needed constant support and review.

After defendant left the orphanage, he went to live with foster parents Myrtle and David Shephard. When the Sexton children were originally taken into protective custody, the Shephards took defendant's sister into their home. While defendant was at the orphanage, he was also permitted some visits to the Shephards' home. Myrtle Shephard testified that while defendant lived with them he caused no problems and obeyed house rules. He was helpful around the house and treated the Shephards as if they were his parents; during this time he attended Sanderson High School. After defendant was arrested Myrtle Shephard visited him in prison; and he expressed remorse for the crimes he committed. In addition he wrote to her and expressed similar remorse. He also wrote that he had been given DSS records to look through and discovered for the first time that the reason he was encouraged to seek mental health treatment was that the staff of the orphanage thought he needed help expressing his feelings, was dangerous, or might kill someone.

Dr. Thomas W. Brown was accepted by the court as an expert in psychiatry. He examined defendant in August 1991, reviewed DSS records, and reviewed earlier psychiatric and psychological assessments made of defendant. He opined that defendant suffered from borderline personality disorder, which "describes people who because of early bad circumstances in a family end up in adult hood [sic] with a real inner emotional lack." Such people have few and poor coping skills, and as adults they deal very poorly with stress, relationships, and anger. Lacking emotional resources, they are vulnerable to being impulsive, volatile, and unable to cope well and to leading unpredictable, chaotic lives. They are much more likely "to get actually physically violent rather than just shake [a] fist and walk away." Dr. Brown also testified that defendant's IQ was "not in the range that officially warrants a diagnosis of mental retardation." Nevertheless, defendant had a severe degree of personality impairment and was suffering from this condition at the time of the crimes. Dr. Brown also testified defendant would be able to adapt and function in the structured environment of prison.

On cross-examination Dr. Brown testified that impulsiveness is part of borderline personality disorder and that defendant was impulsive. Defendant's records indicated he had been diagnosed in the past as having antisocial personality disorder, a hallmark of which "is lack of or relatively little conscience." The guidance from the orphanage and from the Shephards simply came too late to permit defendant to make a permanent improvement in his life. Dr. Brown opined that defendant would do better in the prison environment than anywhere else but also stated that he was a potentially dangerous person.

Dr. Brad Fisher was accepted by the court as an expert in psychology. He interviewed the defendant in November 1990 and twice in September 1991. Dr. Fisher also reviewed other psychological and psychiatric diagnoses, DSS records, and information from the orphanage and the training school. He testified that defendant had a severe personality disorder and had been diagnosed in the past as having antisocial personality disorder, narcissistic personality disorder, and oppositional character. These diagnoses overlap and generally describe a person with poor coping skills and a tendency towards misconduct in stressful situations. Asked whether defendant could conform his actions to the requirements of law, Dr. Fisher stated that because of defendant's relatively normal level of intelligence, he would stop at a stop sign. "He would do the normal

things[,] but in situations that to him are stressful[,] where we might have some deterioration in the ability to make normal judgments, good judgments, his plummets[;] and that ability is not there or is there only minimally." Dr. Fisher corroborated Dr. Brown's testimony that defendant's family background was chaotic. Further, defendant's condition was chronic. Asked if defendant could be expected to function well in prison, Dr. Fisher said, "They will be aware of his record and will setup [sic] a structure sufficient so that they are comfortable with security." Dr. Fisher agreed that defendant would be able to function in prison. On cross-examination Dr. Fisher agreed with Dr. Brown that defendant had little conscience, was impulsive, and was dangerous. Based on defendant's conduct in prison, Dr. Fisher did not agree that he was likely to kill someone; but he admitted that defendant told him he had been involved in a fight in prison.

Four aggravating circumstances were submitted to the jury: First, the murder was committed for the purpose of avoiding or preventing a lawful arrest. N.C.G.S. § 15A-2000(e)(4) (1988). Next, the murder was committed while the defendant was engaged in the commission of a robbery, rape, first-degree sexual offense, or kidnapping. N.C.G.S. § 15A-2000(e)(5). Third, the murder was committed for pecuniary gain. N.C.G.S. § 15A-2000(e)(6). Last, the murder was especially heinous, atrocious, or cruel. N.C.G.S. § 15A-2000(e)(9). The jury found the existence of only three of these circumstances, declining to find circumstance (e)(6).

Thirty-two mitigating circumstances were submitted to the jury. Statutory circumstances included defendant's mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2) (1988); his incapacity to appreciate the criminality of his conduct or to conform it to the requirements of law, N.C.G.S. § 15A-2000(f)(6); his chronological age, N.C.G.S. § 15A-2000(f)(7); his emotional age, N.C.G.S. § 15A-2000(f)(7); and any other circumstance or circumstances arising from the evidence, N.C.G.S. § 15A-2000(f)(9). The jury declined to find the existence of any of these circumstances.

Nonstatutory circumstances submitted and found included that (i) while in prison defendant maintained meaningful relationships with those close to him; (ii) the meaningful relationships provided defendant with guidance and positive support; (iii) while in prison defendant sought to help and advise others; (iv) during defendant's formative years his mother suffered from alcoholism; (v) defendant's

mother was of limited intelligence and mentally unable to provide for and relate to him in a normal mother-child relationship and abandoned him and his siblings at a young age; (vi) because of her problems and limitations, defendant's mother was unable to provide normal or adequate guidance to defendant as a child; (vii) after she was found to be unfit to care for her children, defendant's mother abandoned him and his siblings; (viii) as a young child and adolescent, defendant was deprived of the family nurturing necessary and essential for proper and normal development and growth; (ix) defendant is an adult child of a parent who abused alcohol; (x) since defendant's father died in an automobile accident when defendant was five years old, defendant was unable to have a parental relationship with or receive significant guidance from him; (xi) during his formative years defendant and his siblings were subjected to physical and emotional abuse by his mother and others who occasionally befriended her; (xii) during his formative years defendant was subjected to physical abuse by his surrogate father; (xiii) defendant's mental and emotional disturbances were caused in part by the emotional instability of his family members during his early developmental stages; (xiv) after DSS had to intervene to protect him and his siblings, defendant lived in a series of residences, including an orphanage and a foster home; (xv) from age thirteen defendant was separated periodically from his brother and sister, on account of their status as DSS wards, and this caused defendant much concern and upset; (xvi) during his formative years, defendant's mental and emotional disturbances were caused in whole or in part by the instability of his family; (xvii) defendant's life has great value to him, his family, and friends; and (xviii) defendant could adjust well to the structured environment of life in prison. The jury declined to find eight additional nonstatutory mitigating circumstances.

Pursuant to N.C.G.S. § 15A-2000(b)(2), the jury unanimously found that the mitigating circumstances found were insufficient to outweigh the aggravating circumstances found. Further, under N.C.G.S. § 15A-2000(b)(3), considered with the mitigating circumstances, the aggravating circumstances were sufficiently substantial to call for imposition of the death penalty. Consequently, the jury recommended that defendant be sentenced to death.

Defendant first contends the trial court erred in permitting the State to introduce victim character evidence at the penalty phase and to argue victim impact evidence in support of the death

penalty. Defendant argues that in resubmitting all the evidence presented during the guilt-innocence phase, the State also resubmitted evidence of the victim's character for marital fidelity. Defendant argues further that the evidence functioned as an aggravating circumstance in violation of the rule that aggravating circumstances are limited to those set forth in the capital sentencing statute. We disagree with defendant's contentions.

[17] We turn first to the prosecutor's argument, in which he stated, without objection by defense counsel,

> that Kim Crews was a live, living, breathing person.
>
> She had rights just like Michael Sexton has rights. She had a right to live. She had a right to breathe. She had a right to raise her daughter. She had a right to love her husband and those people have rights, too.
>
> . . . .
>
> It is interesting to me and you'll find mitigating [circumstance] number 25, the defendant's life has great value to him, his family and his friends. And I submit that's true to his family and his friends.
>
> Did Kimberly Crews' life have any great value to those people? Yes, it did. They care about life. She cared about life. You heard on cross-examination from Mr. McMillan about Kimberly Crews. The very kind of people she was trying to save . . . end[ed] her life.

This Court has said, "It is true that the 'rights of the victim' and those of her family are not relevant to the proper focus of sentencing arguments upon the character of the criminal or the circumstances of the crime." *State v. Price*, 326 N.C. 56, 86, 388 S.E.2d 84, 101 (1990), *sentence vacated*, 498 U.S. 802, 112 L. Ed. 2d 7 (1990), *on remand*, 331 N.C. 620, 418 S.E.2d 169 (1992), *sentence vacated*, --- U.S. ---, 122 L. Ed. 2d 113 (1993), *on remand*, 334 N.C. 615, 433 S.E.2d 746 (1993), *sentence vacated*, --- U.S. ---, 129 L. Ed. 2d 888 (1994); *cf. State v. Robinson*, 330 N.C. 1, 409 S.E.2d 288 (1991) (finding no gross impropriety in similar de minimis references during State's argument at the guilt-innocence phase); *State v. Laws*, 325 N.C. 81, 381 S.E.2d 609 (1989) (finding no constitutional error in mere identification of family members present in the courtroom at the opening of the proceedings), *sentence vacated*,

494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 328 N.C. 550, 402 S.E.2d 573 (1991), *cert. denied*, --- U.S. ---, 116 L. Ed. 2d 648 (1991). Nevertheless, where such issues are "the subject of mere allusion by the prosecutor," the error is de minimis, and whether to intervene and recognize the error *ex mero motu* is within the discretion of the trial court. *Price*, 326 N.C. at 86, 388 S.E.2d at 101. In the instant case, the prosecutor's statements quoted above are indistinguishable from those in *Price*. Therefore, we conclude the trial court did not err in not intervening *ex mero motu*.

[18]   We have held herein that on the narrow facts of defendant's case, the trial court did not err by permitting the State to introduce in the guilt-innocence phase rebuttal evidence of the victim's character for marital fidelity. All evidence presented during the guilt-determination phase of a capital case is also "competent for the jury's consideration in passing on punishment." N.C.G.S. § 15A-2000(a)(3) (1988). Moreover, the Eighth Amendment does not prohibit either the admission of evidence or prosecutorial argument concerning a murder victim's personal characteristics. *State v. Jennings*, 333 N.C. 579, 625, 430 S.E.2d 188, 212 (1993) (citing *Payne v. Tennessee*, 501 U.S. 808, 115 L. Ed. 2d 720 (1991) ). In the instant case, evidence of the victim's character was narrowly focused on rebutting defendant's testimony at trial that the victim indicated she wanted to be unfaithful to her husband. Nevertheless, the prosecutor did not make any argument based on the admissible evidence. Under all the circumstances, we conclude there was no violation of defendant's constitutional rights in admitting the evidence at sentencing.

[19]   Defendant next contends the trial court erred in submitting to the jury the aggravating circumstance that the murder "was especially heinous, atrocious, or cruel." N.C.G.S. § 15A-2000(e)(9) (1988). Defendant argues that (i) the circumstance is unconstitutionally vague on its face and was insufficiently defined in the instruction given and (ii) the evidence did not support submitting it to the jury. Again, we disagree.

As required by the United States Supreme Court, this Court has applied a limiting construction to the language of the (e)(9) circumstance. *E.g., State v. Martin*, 303 N.C. 246, 278 S.E.2d 214, *cert. denied*, 454 U.S. 933, 70 L. Ed. 2d 240, *reh'g denied*, 454 U.S. 1117, 70 L. Ed. 2d 655 (1981). Our construction narrows the class of capital felonies in which juries can find this aggravating

circumstance and thus prevents arbitrary or capricious imposition of the death penalty. *State v. Fullwood*, 323 N.C. 371, 399-400, 373 S.E.2d 518, 535 (1988), *sentence vacated*, 494 U.S. 1022, 108 L. Ed. 2d 602, *on remand*, 329 N.C. 233, 404 S.E.2d 842 (1991). The limiting construction was embodied in the instruction given the jury in the instant case, and thus we conclude it was constitutional on its face and as applied.

[20] Propriety of submitting this aggravating circumstance "turns on 'the peculiar surrounding facts of the capital offense under consideration.' *State v. Pinch*, 306 N.C. 1, 35, 292 S.E.2d 203, 228, *cert. denied*, 103 S.Ct. 474 (1982)." *State v. Stanley*, 310 N.C. 332, 335, 312 S.E.2d 393, 395 (1984). This Court has

> identified several types of murders which may warrant submission of circumstance (e)(9): One type includes killings physically agonizing or otherwise dehumanizing to the victim. *State v. Lloyd*, 321 N.C. 301, 319, 364 S.E.2d 316, 328 (1988). A second type includes killings less violent but "conscienceless, pitiless, or unnecessarily torturous to the victim," *State v. Brown*, 315 N.C. 40, 65, 337 S.E.2d 808, 826-27 (1985), including those which leave the victim in her "last moments aware of but helpless to prevent impending death," *State v. Hamlet*, 312 N.C. 162, 175, 321 S.E.2d 837, 846 (1984). A third type exists where "the killing demonstrates an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder." *Brown*, 315 N.C. at 65, 337 S.E.2d at 827.

*State v. Gibbs*, 335 N.C. 1, 61-62, 436 S.E.2d 321, 356 (1993); *accord State v. Syriani*, 333 N.C. 350, 390-91, 428 S.E.2d 118, 140, *cert. denied*, --- U.S. ---, 126 L. Ed. 2d 341 (1993). In addition, "[i]n determining sufficiency of the evidence to support this circumstance, the trial court must consider the evidence in the light most favorable to the State. *State v. Quick*, 329 N.C. 1, 31, 405 S.E.2d 179, 197 (1991)." *Gibbs*, 335 N.C. at 61, 436 S.E.2d at 356.

Applying these principles, the evidence supports a finding that the murder of Kimberly Crews was physically agonizing and involved psychological terror not normally present in murder. The medical evidence permitted the inference that at a minimum death by ligature strangulation would have taken three to four minutes and the victim would have known what was happening for at least ten seconds before losing consciousness. But the amount of time for unconsciousness and death varies depending upon how tightly and

rapidly the ligature was applied, and the only internal injury to the victim's neck was some slight bruising of the tissues over her windpipe. Further, defendant testified that he was in front of or beside her when he strangled her. Hence, in her last moments, the victim, the mother of a young child, lay nude with soaking wet hair on the backseat of her van, as a stranger whom she could look in the eye wrapped her stockings around her neck. Whatever the time span, the minimum or longer, that it took for the victim to lose consciousness, the moments just before and during the strangulation would have been filled with overwhelming panic for the victim who, knowing that death was impending, was helpless to prevent it. To the victim, this ten seconds or longer was not a brief moment. A jury could reasonably infer that as the breath of life was choked out of the victim, she experienced extreme anguish and psychological terror.

In addition, we find defendant's case similar to two other cases of strangulation and sexual assault in which this Court said evidence supported the (e)(9) circumstance, *State v. Artis*, 325 N.C. 278, 384 S.E.2d 470 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991), and *State v. Johnson*, 298 N.C. 47, 257 S.E.2d 597 (1979). In *Artis*, the victim was dragged through the woods and strangled during an act of forcible intercourse; and expert testimony showed that during manual strangulation, a victim would not necessarily lose consciousness immediately and would suffer pain. 325 N.C. at 317-18, 384 S.E.2d at 492. In *Johnson*, submitting the circumstance was proper where evidence showed "that defendant first tried to strangle his victim to death with a fish stringer. Upon rendering her unconscious he sexually molested her. Then, realizing she was not dead, he stabbed her to death." 298 N.C. at 82, 257 S.E.2d at 621-22.

Finally, cases in which we have found the evidence insufficient to support submission of the circumstance are distinguishable. *State v. Hamlet*, 312 N.C. 162, 176, 321 S.E.2d 837, 846 (1984) (stating that the victim was unconscious and unable to feel any pain after being shot and was unaware of defendant's presence); *Stanley*, 310 N.C. at 340-41, 312 S.E.2d at 398 (stating no evidence showed victim suffered a prolonged or torturous death or that defendant heard any words she might have said). By contrast, it is highly unlikely that the victim in the instant case was unaware of defendant's presence and murderous purpose. For all the foregoing reasons,

STATE v. SEXTON

[336 N.C. 321 (1994)]

we conclude the trial court did not err in submitting this aggravating circumstance for the jury's consideration.

[21] Defendant also contends the trial court erred in failing to submit the mitigating circumstance that he had "no significant history of prior criminal activity." N.C.G.S. § 15A-2000(f)(1) (1988). Again, we disagree.

The Criminal Procedure Act provides that in capital sentencings, "[i]nstructions *determined by the trial judge to be warranted by the evidence* shall be given by the court in its charge to the jury prior to its deliberation." N.C.G.S. § 15A-2000(b) (1988) (emphasis added). Initially, "the trial court is required to determine whether a rational jury could conclude that defendant had no *significant* history of prior criminal activity." *State v. Wilson*, 322 N.C. 117, 143, 367 S.E.2d 589, 604 (1988). If the trial court concludes that the jury could so find from the evidence, then whether the evidence does in fact constitute a significant history of criminal activity is for the jury to decide. *Id.*

For the purposes of N.C.G.S. § 15A-2000(f)(1) " ' "[S]ignificant" means that the activity is likely to have influence or effect upon the determination by the jury of its recommended sentence.' " *State v. Artis*, 325 N.C. at 314, 384 S.E.2d at 490 (quoting Martin, J., concurring in *State v. Wilson*, 322 N.C. at 147, 367 S.E.2d at 609) (alteration in original). Further, "it is not merely the number of prior criminal activities, but the nature and age of such acts that the trial court considers in determining whether by such evidence a rational juror could conclude that this mitigating circumstance exists." *Id.*

In the instant case, defendant did not request that the (f)(1) circumstance be submitted to the jury. The evidence of defendant's prior criminal activity was a conviction for forgery and uttering on 1 May 1989 and conviction for two counts of assault on a female on 22 October 1989. One of these counts was assault by choking which occurred less than one year before the strangulation of Kimberly Crews. Defendant testified he did not remember choking his former victim, a circumstance strikingly similar to his professed lack of memory as to details of the strangulation of Kimberly Crews. Given the nature and recency of his record of assault, we cannot say that the trial court erred in determining that no reasonable juror could have concluded defendant's criminal history was in-

significant. Therefore, we conclude the trial court did not err by not submitting the (f)(1) circumstance for the jury's consideration.

Finally defendant contends that the trial court erred by failing to intervene *ex mero motu* during the prosecutor's argument at the close of the sentencing proceeding. As during closing arguments for the guilt-innocence phase, defense counsel made no objection during closing argument in the sentencing proceeding. Defendant again argues that the prosecutor improperly argued victim impact evidence; but we have concluded that the prosecutor's reference to the victim's rights was de minimis. Defendant also argues that the prosecutor delivered a harangue against the calm and rational consideration of evidence as required by due process and improperly condemned defense counsel's conduct as "ravishing and degrading" the victim. We have carefully reviewed the argument and find it was within the wide latitude permitted by case law. *E.g., State v. Price*, 326 N.C. 56, 84, 388 S.E.2d 84, 100 (1990).

## PRESERVATION ISSUES

[22] Defendant raises two additional issues which he concedes have been decided against him by this Court: (i) The North Carolina death penalty statute, and consequently the death sentence in this case, are unconstitutional and (ii) the trial court erred in denying defense counsel's motion to withdraw from representation, or in the alternative to select a new jury after the guilty verdicts, because the jurors' rejection of the defense theory and counsel's role in presenting it would have precluded their rational consideration of evidence submitted in mitigation. We have considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Therefore, we overrule these assignments of error.

## PROPORTIONALITY

Having found defendant's trial and capital sentencing proceeding free of prejudicial error, we are required by statute to review the record and determine whether (i) the record supports the existence of the aggravating circumstances on which the court based its sentence of death, (ii) the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (iii) the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and defendant. N.C.G.S. § 15A-2000(d)(2) (1988); *State v. McCollum*, 334 N.C.

208, 239, 433 S.E.2d 144, 161 (1993); *State v. Robbins*, 319 N.C. 465, 526, 356 S.E.2d 279, 315, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987).

We have held that the record supports the jury's finding the murder to be especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). The record also supports the jury's findings that the murder was committed for the purpose of avoiding or preventing a lawful arrest, N.C.G.S. § 15A-2000(e)(4), and while the defendant was engaged in the commission of first-degree rape, first-degree sexual offense, first-degree kidnapping, and common-law robbery, N.C.G.S. § 15A-2000(e)(5). Defendant was convicted of first-degree murder upon theories both of premeditation and deliberation and of felony murder; and both theories are supported by the evidence. Therefore, the underlying felonies of first-degree rape, first-degree sexual offense, first-degree kidnapping, and robbery were properly submitted in aggravation. *State v. McNeil*, 324 N.C. 33, 57, 375 S.E.2d 909, 923 (1989), *sentence vacated*, 494 U.S. 1050, 108 L. Ed. 2d 756, *on remand*, 327 N.C. 388, 395 S.E.2d 106 (1990), *cert. denied*, 499 U.S. 942, 113 L. Ed. 2d 459 (1991). We also conclude that nothing in the record suggests the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

[23] We turn to our final statutory duty, proportionality review. We first compare similar cases from a pool of all cases arising after 1 June 1977, the effective date of the capital punishment statute. We consider cases tried capitally and found free of error upon direct appeal to this Court and in which the jury recommended death or life imprisonment or the trial court imposed life imprisonment after the jurors failed within a reasonable period of time to agree upon a sentencing recommendation. *State v. Syriani*, 333 N.C. 350, 400, 428 S.E.2d 118, 146, *cert. denied*, --- U.S. ---, 126 L. Ed. 2d 341 (1993). Our consideration is also limited to cases roughly similar as to the crime and the defendant. *Id.*

Salient characteristics of the instant case include (i) an attack on a random victim; (ii) a brutal strangulation, found by the jury to be especially heinous, atrocious, or cruel, in the course of kidnapping, rape, and sexual offense; (iii) defendant's insistence, even in the face of clear evidence to the contrary, that the victim consented to the sexual acts; (iv) defendant's insistence, notwithstanding clear evidence to the contrary, that he left the victim alive; and (iv) de-

fendant's theft of the dead victim's personal effects and subsequent theft from her bank account. The jurors found three aggravating circumstances and declined to find the existence of any of the five statutory mitigating circumstances submitted for their consideration. Of the twenty-seven nonstatutory mitigating circumstances submitted, the jury found eighteen existed.

"Of the cases in which this Court has found the death penalty disproportionate, only two involved the 'especially heinous, atrocious, or cruel' aggravating circumstance. *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983)." *Syriani*, 333 N.C. at 401, 428 S.E.2d at 146-47. *Stokes* and *Bondurant* are not similar to the instant case.

*Stokes* is dissimilar in that it involved a group who planned to rob a place of business, but no evidence showed who was the ringleader. By contrast, defendant Sexton alone was responsible for all the crimes in the instant case. Further, defendant Stokes was only seventeen years old, but defendant Sexton was twenty-three years old at the time of the murder. In addition, in *Stokes* there was no evidence of premeditation and deliberation, but defendant Sexton was convicted upon this theory, as well as felony murder.

*Bondurant* is dissimilar in that the defendant immediately exhibited remorse and concern for the victim's life by helping him get medical treatment. By contrast, defendant Sexton showed no concern for Kimberly Crews' life. Notwithstanding his testimony that he thought she was not dead, the evidence showed he robbed her of her personal effects and went immediately to a bank in order to attempt, and succeed at, further theft.

In *State v. McCollum*, 334 N.C. at 240-42, 433 S.E.2d at 162-63, this Court reviewed the seven cases, including *Stokes* and *Bondurant*, in which we have thus far found the death penalty disproportionate.[2] In only one of the cases, *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985), did the jury find the existence of multiple aggravating circumstances. In *Young*, this Court

---

2. The five cases in addition to *Stokes* and *Bondurant* are as follows: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

STATE v. SEXTON

[336 N.C. 321 (1994)]

focused on the failure of the jury . . . to find either the aggravating circumstance that the murder was especially heinous, atrocious, or cruel, or the aggravating circumstance that the murder was committed as part of a course of conduct which included the commission of violence against another person or persons.

*McCollum*, 334 N.C. at 241, 433 S.E.2d at 162. The instant case is dissimilar to *Young* in that three aggravating circumstances, including especially heinous, atrocious, or cruel were found by the jury.

For all the foregoing reasons, we conclude that each of the cases wherein this Court has found the death penalty to be disproportionate is distinguishable from the instant case.

In performing our statutory duty of proportionality review, it is also appropriate for us to compare the case before us to other cases in the pool used for proportionality review. *Lawson*, 310 N.C. at 648, 314 S.E.2d at 503. If, after making such comparison, we find that juries have consistently returned death sentences in factually similar cases, we will have a strong basis for concluding that the death sentence under review is not excessive or disproportionate. If juries have consistently returned life sentences in factually similar cases, however, we will have a strong basis for concluding that the death sentence in the case under review is disproportionate.

*McCollum*, 334 N.C. at 242, 433 S.E.2d at 163.

In *State v. Artis*, 325 N.C. 278, 384 S.E.2d 470, (1989), *sentence vacated*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991), defendant argued that a numerical analysis of proportionality pool cases involving sexual assault showed that juries recommended life sentences in over half of such cases. The Court, noting the inaccuracy in defendant's statistics, *id.* at 339, 384 S.E.2d at 505 (footnotes omitted), stated "[n]umerical disparity, whether in favor of the [S]tate or in favor of the defendant, is not dispositive on proportionality review." *Id.* at 340, 384 S.E.2d at 505. Instead, we "proceed with factual comparisons within the category of murders accompanied by sexual assault." *Id.* at 340, 384 S.E.2d at 506.

In another death-affirmed case involving rape and kidnapping cited therein, *State v. Rook*, 304 N.C. 201, 283 S.E.2d 732 (1981),

*cert. denied,* 455 U.S. 1038, 72 L. Ed. 2d 155 (1982), significant mitigating evidence was presented; but the jury also found that the murder was especially heinous, atrocious, or cruel. Since the decision in *Artis*, two additional cases involving sexual assault have come into the pool. *State v. Jennings,* 333 N.C. 579, 430 S.E.2d 188 (1993); *State v. Richardson,* 328 N.C. 505, 402 S.E.2d 401 (1991). In *Richardson*

[t]he jury returned verdicts of guilty of common law robbery, first-degree rape, and first-degree murder, finding both that the murder occurred during the commission of the felonies of rape and common law robbery and that it was committed with malice, premeditation and deliberation. The jury found aggravating circumstances and no mitigating circumstances, but nevertheless recommended life imprisonment for the murder conviction.

328 N.C. at 506-07, 401 S.E.2d at 402. Defendant Richardson was not charged with kidnapping. We have reviewed the record, which shows that only two aggravating circumstances, murder committed during the course of rape and pecuniary gain, were submitted; and the jury found both existed. Again, significant mitigating evidence was presented. We find defendant Sexton's case distinguishable on the basis that the jury in *Sexton,* unlike the juries in *Young* and *Richardson,* found the especially heinous, atrocious, or cruel circumstance.

*Jennings* involved not rape but sexual assault by a wife on her eighty-year-old husband. Although the nature of the assault was more grisly than in defendant's case, both defendants were convicted of murder upon theories both of premeditation and deliberation and felony murder and both juries found the existence of the (e)(9) circumstance. In *Jennings,* one mitigating circumstance labeled a statutory circumstance, "no record of criminal convictions," was submitted and found to exist by the jury. 333 N.C. at 630, 430 S.E.2d at 215. Twenty-one nonstatutory mitigating circumstances were submitted; of these the jury found the existence of three. *Id.* at 615, 630, 430 S.E.2d at 206, 215. The jury recommended death.

On its facts, defendant's case is clearly more like *Artis* and *Rook* and it shares with *Jennings* the finding of the existence of the (e)(9) circumstance. In light of all the cases discussed herein, we cannot say that the sentence imposed was excessive or dispropor-

tionate, considering both the crime and the defendant. We hold defendant received a fair trial and capital sentencing proceeding free of prejudicial error and that the death penalty is not disproportionate.

NO ERROR.