**STATE v. BARBER**

[120 N.C. App. 505 (1995)]

STATE OF NORTH CAROLINA v. CALVIN WAYNE BARBER

No. COA94-872

(Filed 7 November 1995)

**1. Evidence and Witnesses § 649 (NCI4th)— motion to suppress evidence of underlying facts of prior convictions— failure to rule on motion—right to testify on own behalf not affected**

The trial court did not impermissibly chill defendant's right to testify on his own behalf when it declined to rule on his motion *in limine* to suppress Rule 404(b) evidence of the underlying facts of prior convictions, since the trial court did not issue a bold denial of defendant's motion but instead deferred his decision on the matter until such time as the facts and context would allow him to make a well reasoned decision; it did not appear that defendant's decision to testify hinged on the court's ruling; and even if the court did err, such error would not be fatal, as there was other competent evidence of his guilt.

**Am Jur 2d, Motions, Rules and Orders § 26.**

**Modern status of rules as to use of motion in limine or similar preliminary motion to secure exclusion of prejudicial evidence or reference to prejudicial matters. 63 ALR3d 311.**

**2. Evidence and Witnesses § 765 (NCI4th)— rape victim's memory problems—defense opened door to evidence— admissibility to reestablish officer's credibility**

The trial court in a rape case did not err when it allowed the investigating officer to testify on redirect that the victim's inconsistent statements were only memory problems common to victims of sex crimes, since this evidence was not inadmissible expert opinion testimony of the victim's credibility but was instead admissible to reestablish the officer's credibility after the defense opened the door by calling into question the thoroughness of her investigative report.

**Am Jur 2d, Appellate Review § 753.**

Appeal by defendant from judgments entered 10 March 1994 by Judge B. Craig Ellis in Cumberland County Superior Court. Heard in the Court of Appeals 4 April 1995.

**STATE v. BARBER**

[120 N.C. App. 505 (1995)]

*Attorney General Michael F. Easley, by Special Deputy Attorney General Ronald M. Marquette, for the State.*

*Office of Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender J. Michael Smith, for defendant appellant.*

McGEE, Judge.

Defendant, Calvin Wayne Barber, was indicted on 19 April 1993 on four counts of first degree sexual offense, one count of first degree rape, and one count of first degree kidnapping. The cases were joined for trial and were heard before a jury at the 7 March 1994 Criminal Session of Cumberland County Superior Court with Judge B. Craig Ellis presiding. Defendant was convicted of one count of first degree rape, four counts of first degree sexual offense and one count of first degree kidnapping. Judge Ellis vacated the conviction for first degree kidnapping and entered conviction for second degree kidnapping. Defendant was sentenced to three consecutive terms of life in prison. From these judgments, defendant appeals.

The State's evidence tended to show the following. The victim was an eighteen-year-old high school senior. On the evening of 4 March 1993 at approximately 10:30 p.m., she had finished work at a Cumberland County bingo parlor and was waiting at a nearby restaurant for her mother to pick her up. Initially, the victim stood in front of the bingo parlor, but a security guard instructed her to wait in front of a nearby restaurant because he felt it would be safer.

As the victim waited for her mother, defendant approached her and engaged her in conversation. The victim described defendant as a very dirty, heavy-set man in need of a shave who had long, greasy, curly hair. Defendant grabbed her hair, jerked her head back, stuck a knife to her neck, and pinned her arms up against the wall. He led her to a dumpster at the side of the building where she thought he was going to take her pocketbook. Defendant said that was not what he wanted and led her into a wooded area and made her sit down. Defendant kept trying to touch her and asked if she had ever been raped by her father.

Defendant told the victim to take off her glove and he laid his knife in her hand. Defendant said something about wanting her to trust him. On his knees in front of her, defendant searched her purse

STATE v. BARBER

[120 N.C. App. 505 (1995)]

and asked her questions. The victim did not put her glove back on after defendant took back his knife. Defendant threatened to slice her throat and leave her in the woods where no one would find her. The victim told defendant she did not want to die.

Defendant took the victim towards a trailer park, holding her with his left hand and keeping the knife in his right hand. The victim was scared and told defendant that she wanted to go home. As they walked past the trailer park, she saw two men walk by, but defendant told her not to call out. About fifteen minutes after leaving the wooded area, they arrived at a green-colored duplex later identified as defendant's residence. Defendant locked the door behind them, reminding the victim he still had the knife and that he would use it. Defendant led her to his bedroom and told her to undress and get on the bed. The victim told defendant that she "didn't want to do nothing" and "wanted to go home," but defendant threatened to get the knife. Defendant took off his clothes. He put his fingers inside the victim's vagina. She was crying and defendant repeatedly told her to shut up. Defendant inserted his tongue into her vagina and then forced the victim to perform oral sex on him. Defendant raped the victim. She felt a sharp pain when it seemed defendant attempted to put his penis in her rectum. Later the victim got up and went to the bathroom. When she returned, defendant grabbed her and forced her to have oral sex again. Later the victim saw defendant's eyes were closed and believing he might have passed out, she waited in the bed for fifteen minutes. When he did not move, she dressed, left the house and went down the street to a store and called her mother.

Cross-examination revealed minor inconsistencies between the victim's testimony and her statements to various people that evening. The victim's mother testified that when she arrived to pick up her daughter after work, she did not see her and could not find her anywhere. She called the police and reported her daughter missing, then returned home to wait by the phone. About two and one-half hours later, her daughter called, screaming "Mama, please come and get me. Mama, he's hurt me. Please." The mother called the police and told them her daughter had called from a convenience store near where she worked, and the mother went there immediately. She found her daughter on the ground, in a fetal position, surrounded by law enforcement officials. She testified she had never seen her daughter so upset before. The victim was transported by ambulance to the Cape Fear Hospital emergency room.

**STATE v. BARBER**

[120 N.C. App. 505 (1995)]

Sergeant Terri Putnam of the Cumberland County Sheriff's Department Sex Crimes Unit testified she was dispatched to the store where the victim was located and was briefed at the scene. She drove around the area and then went to the hospital to interview the victim. Sergeant Putnam found the victim in an examination room crying. She explained to the victim that it was important to understand what had happened, and she then conducted a "substance of oral interview" which does not involve taking a person's statement word-for-word but involves listening for key comments. Sergeant Putnam did not deem a word-for-word statement necessary because the incident was a recent one and identifying the perpetrator and obtaining fresh untainted evidence were her key concerns.

Sergeant Putnam took the victim back to the neighborhood where the crimes occurred and she identified the residence where she was raped. Sergeant Putnam returned the victim to her parents and drew up a search warrant, listing personal items the victim had been wearing that evening. During the search of the house, a water bill, power bill, and a social security card, all in defendant's name, were found. None of the victim's personal items were found. Sergeant Putnam searched the woods for the victim's glove but it was not located.

After defendant was arrested, he made two separate statements to Sergeant Putnam. First, he stated that he met a girl, with the same name as the victim, on the street who agreed to perform sexual acts with him for fifty dollars. They went to his home and performed those acts. However, he refused to pay her because she was "lousy." In his second statement he said he made no attempt to remove or hide anything from his residence and that the knife he had was used as a tool, not as a weapon.

Detective Nancy Cressler of the Cumberland County Sheriff's Department testified she assisted Sergeant Putnam in the search of defendant's residence and in the search for the missing glove. When she arrested defendant, she found a knife in the pocket of defendant's trousers which the victim identified as the knife defendant used on her.

Dr. Darryl Simpkins was the emergency room physician on duty at the hospital on 5 March 1993 when the victim arrived. Because she was brought in with a complaint of sexual assault, Dr. Simpkins performed an examination, and he observed a tearing of the skin near the victim's rectum. Dr. Simpkins testified it takes tremendous force to tear the skin similar to the tear he observed on the victim's body. He

stated the tear could have been caused by an attempted penile insertion. Defendant presented no evidence.

## I.

**[1]** Defendant argues he is entitled to a new trial because before defendant decided to testify, the trial court impermissibly chilled his right to testify on his own behalf when it declined to rule on his motion *in limine* to suppress 404(b) evidence of the underlying facts of prior convictions. In support of his position, defendant cites *State v. Lamb*, 321 N.C. 633, 365 S.E.2d 600 (1988). We find *Lamb* distinguishable.

In *Lamb*, the defendant was indicted for the first-degree murder of her husband but due to the lack of evidence against her, the charges were dismissed "[w]ith [l]eave [p]ending the completion of the investigation." *Lamb*, 321 N.C. at 635, 365 S.E.2d at 601. A year later, several of defendant's relatives came forward with information implicating defendant in her husband's murder and she was reindicted.

The case against the defendant was based largely on the testimony of defendant's relatives who initially denied knowing anything about the murder. Later, they all stated the defendant had admitted to the crime and had also admitted to being involved in other murders. Defendant had never been indicted for these other killings and she filed a pre-trial motion *in limine* to have any evidence of these alleged killings excluded. *Id.* at 636, 365 S.E.2d at 601. Even though it was clear that defendant's decision to testify depended upon the court's ruling on the motion, *Id.* at 648, 365 S.E.2d at 608, the court delayed its decision until just before "the close of defendant's evidence, but before she had rested or taken the stand" when it denied the motion. *Id.* at 636, 365 S.E.2d at 601-02. Based on this denial, defendant declined to take the stand and she was convicted of second-degree murder.

The Court of Appeals in *Lamb* ruled that the denial of the motion was prejudicial error because the evidence in question was inadmissible under any of the evidentiary rules and the trial court's failure to exclude the evidence by granting the motion prevented defendant from testifying, thereby prejudicing her. *Id.* at 636, 365 S.E.2d at 602. In affirming the Court of Appeals, the Supreme Court noted that "[n]ot every denial of a defendant's motion *in limine* results in a chilling of defendant's right to testify. Whether this result occurs depends

on the peculiar facts of each case." *Lamb*, 321 N.C. at 648, 365 S.E.2d at 608.

From the record before us, we find the trial court did not abuse its discretion in deferring a ruling on the motion *in limine*. While it may have been preferable for the court to have ruled on this motion earlier, the court's handling of the matter and its basis for deferred ruling were reasonable and did not constitute an abuse of discretion. Unlike *Lamb*, this judge did not erroneously issue a "bald denial" of defendant's motion; rather, he deferred his decision on the matter until such time as the facts and context would allow him to make a well-reasoned decision.

It is not clear that defendant's decision to testify rested solely on the trial court's decision on the motion *in limine*. Defendant's attorney stated the ruling would be a factor, but did not say the decision to have defendant testify hinged on the ruling.

In *Lamb*, the State's case "rested so completely" on the testimony of defendant's relatives (the subject of the motion *in limine*) that the court prejudiced defendant when it denied the motion, thereby discouraging defendant from exercising her right to take the stand to refute her relatives' testimony. *Id.* at 649, 365 S.E.2d at 608. Here there was strong evidence to support defendant's conviction without the use of the evidence of prior convictions which defendant sought to exclude in the motion *in limine* (there was no question of identity and the case was essentially reduced to the issue of consent).

Finally, we note the defendant in *Lamb* was never given the assurance that if she decided to testify, the court would protect her from impermissible evidence being used to impeach her. *Id.* at 649, 365 S.E.2d at 609. When the motion was renewed near the close of defendant's evidence, the judge stated "I'm not going to put the muzzle on on [sic] cross-examination, if that is what the question is." *Id.* at 646, 365 S.E.2d at 607. In this case, the trial court used a fair and balanced approach to the issue. At the beginning of the trial the court stated:

> It's difficult for me to rule on what the evidence is going to be until I've heard what the evidence is. I don't know what the evidence in this case is . . . [s]o at this point I don't think I'm in any position to rule whether or not it's admissible . . . . So we'll defer it until a later session. We can bring it up, either side may bring it up at a later time out of the presence of the jury. And we'll discuss it further when we get further along in the case.

**STATE v. BARBER**

[120 N.C. App. 505 (1995)]

At the conclusion of the State's evidence, the motion *in limine* was renewed and the court further explained:

> Well, sir, the rules permit 404(b) type information be received if it meet [sic] certain criteria. But until it is asked, I don't see how I can rule one way or the other. If it's admissible then I would admit it. And if it is not admissible, then I will not allow it to be admitted.
>
> The State at this point has not tried to introduce it in its case in chief. So the issue as anticipated at the beginning of the trial, or the motions in limine, have not arisen. But at this point I don't feel that I can give you a definitive ruling as to whether or not questions about those cases would be permitted. But we would certainly hear it out of the presence of the jury first if it should be elicited.

"The Rules of Evidence are not to be applied in a vacuum; they are to be applied in a factual context. A trial court makes its decisions as that factual context unfolds and as the circumstances warrant." *Lamb*, 321 N.C. at 648, 365 S.E.2d at 608. We find *Lamb* distinguishable and overrule defendant's assignment of error.

Even if the trial court had committed error in its ruling on the motion *in limine*, the error would not be fatal in this case under the holding of *State v. Norris*, 101 N.C. App. 144, 398 S.E.2d 652 (1990), *disc. review denied*, 328 N.C. 335, 402 S.E.2d 843 (1991). In *Norris*, the Court cited *Lamb* but held that "while it does appear from the record that the defendant chose not to testify at least in part because he feared being impeached with his 1975 conviction, there was such overwhelming evidence of his guilt that his failure to take the stand did not rise to the level of prejudicial error." *Id.* at 148, 398 S.E.2d at 655.

Under the facts of this case, there was no question of identity of the perpetrator because defendant admitted having engaged in intercourse with a woman with the same name as the victim whom he met that night on the street. Therefore, the jury was left with the question of whether to believe defendant's story that the victim, an eighteen-year-old high school student, was in fact a prostitute who was extracting revenge from defendant because he had refused to pay her $50 fee, or the victim's story that she was abducted and raped by defendant.

## II.

**[2]**  Defendant's second argument is that the trial court committed reversible error when it allowed Sergeant Putnam to testify that the victim's inconsistent statements were only memory problems common to victims of sex crimes, on the ground that this evidence was inadmissible expert opinion testimony of a witness' credibility. We disagree.

The testimony at issue included the following exchange:

Q.  Sergeant Putnam, in your one and a half years in the Sex Crimes Unit and through all the schools that you've gone to and the training that you've gone to in the Sex Crimes Unit, was it significant that Ms. Chandler left out some details regarding what had happened?

A.  No, ma'am.

Mr. Broun: Objection, your Honor. That's opinion evidence.

The Court: Overruled.

Ms. Cox: Thank you.

A.  That is something that I have learned through training which is quite common in these type cases. Through training I have been instructed that a lot of times in this type of a situation a victim wants to forget what has happened. And therefore, immediate recall is not always what we might think it ought to be.

Q.  Sergeant Putnam, was it your intention to go back and do a more detailed report?

A.  Yes, ma'am, it was.

Q.  But you didn't do it?

A.  No, ma'am, I did not.

This testimony was not expert opinion testimony, but even if it were, it was admissible under these facts. As the State points out, the questionable testimony came during redirect by the State after defense counsel had asked Sergeant Putnam numerous questions implying that Sergeant Putnam had prepared an inadequate investigative report of her oral interview with the victim. The defense "opened the door" by suggesting poor investigative work, and Sergeant Putnam was simply attempting to reestablish her credibility by explaining why some details were left out of her report.

In *State v. Baymon*, the Supreme Court stated that although an expert witness may not testify that a particular prosecution witness is believable or is not lying, otherwise inadmissible evidence is admissible if the door has been opened by defendant's cross-examination of the expert. *See State v. Baymon*, 336 N.C. 748, 752, 446 S.E.2d 1, 3 (1994). "Opening the door refers to the principle that where one party introduces evidence of a particular fact, the opposing party is entitled to introduce evidence in explanation or rebuttal thereof, even though the rebuttal evidence would be incompetent or irrelevant had it been offered initially." *State v. Sexton*, 336 N.C. 321, 360, 444 S.E.2d 879, 901, *cert. denied*, 115 S.Ct. 525, 130 L. Ed. 2d. 429 (1994).

In this case, the defense's cross-examination of Sergeant Putnam attempted to undermine her credibility by calling into question the thoroughness of her investigative report. It opened the door for the State on redirect to reestablish Putnam's reliability. "The purpose of redirect examination is to clarify any questions raised on cross-examination concerning the subject matter of direct examination and to confront any new matters which arose during cross-examination." *Baymon*, 336 N.C. at 754, 446 S.E.2d at 4. Defendant's cross-examination of Putnam rendered the challenged testimony admissible on redirect examination.

The defendant received a fair trial, free from prejudicial error.

No error.

Judges JOHNSON and COZORT concur.